Filed 12/3/25; Modified and Certified for Publication 12/29/25 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| GLORIA RUCKMAN et al., | F086037 & F086187 |
| Plaintiffs and Respondents, | (Consolidated) |
| v. | (Super. Ct. No. BCV-15-101699) |
| AG-WISE ENTERPRISES, INC., | |
| Defendant and Appellant. | **OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Kern County.  Bernard C. Barmann, Jr., Judge.

Horvitz & Levy, Jason R. Litt, and Peder K. Batalden; Grant, Genovese & Baratta, James M. Baratta, Lance D. Orloff, and Andrew S. Attia for Defendant and Appellant.

Rodriguez & Associates, Daniel Rodriguez and Chantal A. Trujillo; The Law Firm of Joseph H. Low IV and Joseph Hawkins Low IV, and Esner, Chang, Boyer & Murphy, Andrew N. Chang and Kevin K. Nguyen for Plaintiffs and Respondents.

-ooOoo-

In 2015, an employee of Big N Deep Ag Development Co. (BND), excavating soil with a bulldozer on property owned by Wildwood Farms, LLC (Wildwood) ruptured a high-pressure underground gas line resulting in an explosion and fire that killed the employee and injured several neighbors—plaintiffs—on adjoining property.  Plaintiffs filed a personal injury lawsuit against multiple defendants including Wildwood's property manager, Ag-Wise Enterprises, Inc. (Ag-Wise), who hired BND to perform the excavation work.  Following a jury trial, plaintiffs were awarded $73 million in past and future noneconomic damages with liability split amongst the defendants including Ag-Wise.  The trial court awarded costs to plaintiffs including prejudgment interest under Civil Code section 3291 and expert witness fees under Code of Civil Procedure[1] section 998.

On appeal, Ag-Wise contends:  (1) the trial court's instruction on the retained control exception to a hirer's liability was unsupported by the evidence and inaccurately stated the law; (2) the court erroneously refused to instruct the jury on the collateral negligence exception to the peculiar risk doctrine; (3) plaintiffs' attorneys engaged in prejudicial misconduct; (4) plaintiffs' damages award is excessive; and (5) the award of interest and costs should be reversed because plaintiffs' section 998 offer was not made in good faith.

We affirm the judgment and post-judgment cost order.

## FACTUAL AND PROCEDURAL BACKGROUND

I.      **Facts.**

We summarize the facts and evidence in the light most favorable to the judgment. (*Cassim v. Allstate Ins. Co.* (2004) 33 Cal.4th 780, 787 (*Cassim*).)

A.      *The explosion*.

In 2015, Wildwood purchased agricultural land near Wible Road and Houghton

---

[1]      Undesignated statutory references are to the Code of Civil Procedure.

Road in Kern County (the property) from Oasis Turf, LLC (Oasis). Robert Sandrini was Oasis's owner and used the property for sod farming. Around the time Wildwood purchased the property, Wildwood and Oasis entered a lease-back agreement permitting Oasis to finish harvesting the sod on the property.

Gloria and Robert Ruckman had finished building a house on the adjoining land to the property in July 2015. The Ruckmans lived in the house with their son, Robert (Young Robert), born in October 2015.[2]

Wildwood intended to plant almond trees on the property and contracted with Ag-Wise to manage the property. Ag-Wise's owner and president, Ed Kuykendall, hired Jeff Alexander, doing business as BND, to excavate the soil[3] on the property to prepare it for almond trees. Ag-Wise had previously contracted with BND to perform excavation work. Ag-Wise and BND had a verbal agreement but did not execute a written contract before BND started the work.

Kuykendall and Alexander met twice before BND began the excavation work to discuss the area to be excavated and lines on the property to avoid. Kuykendall wanted the ripping to go a minimum depth of five feet as the industry standard for almond trees. He told Alexander to wait until Oasis was finished harvesting the sod before excavating part of the property.

The 811 program provides a single location for excavators to request all utility companies locate and mark the location of their underground utilities before excavation work is performed. On October 8, 2015, Alexander called the 811 program to request an underground service alert (USA) permit[4] for the excavation work to be performed on the

---

[2]    We use plaintiffs' first names hereafter when referring to them individually for clarity. We refer to the Ruckmans' son as Young Robert as he was during trial.

[3]    The excavation work is also referred to as "soil ripping" or "deep ripping."

[4]    Though the record refers to both a USA "ticket" or "permit," we use the term "permit."

property at the northwest corner of Houghton Road and Wible Road on the north side of Houghton Road. A permit issued in response to Alexander's request with an expiration date of November 5, 2015.

Pacific Gas and Electric Company (PG&E) owned an underground high-pressure 34-inch gas transmission line, line 300A, that ran through the property where the excavation work was to be performed. In response to BND's permit, John Hancock, a PG&E employee, identified line 300A's location using yellow flags. The yellow flags marking the pipeline's path were approximately 100 feet apart from one another, although the flags were supposed to be spaced no farther than 50 feet apart. Hancock noted on the permit: "No excavation is allowed without a standby on-site." After the permit expired on November 5, 2015, no one requested an extension of the permit or a remark of the lines.

Aboveground paddle markers on Wible Road indicated there was a gas transmission line in the vicinity of the property. PG&E did not provide a standby or have a field meet with BND prior to the excavation work. BND employees performing the excavation work, including Michael Ojeda, were aware the gas line went through the property.

On November 12, 2015, Ag-Wise notified Alexander the sod farming on the property was done. BND had created a buffer zone around the gas line in parts of the field, but not where the sod had been harvested.

On November 13, 2015, eight days after the USA permit had expired, Ojeda was ripping soil on the property using a 180,000-pound bulldozer with a shank hooked to the back. The shank struck and ruptured line 300A. The ruptured line caused an explosion and created two jet flames.[5] The bulldozer flipped over and landed 30 to 40 feet from the

---

[5]     Another BND employee, Gerald Russ Martin, previously struck the same gas line one mile from the property on October 24, 2014, while deep ripping with a bulldozer for BND before PG&E had marked the gas line. That strike lifted the bulldozer up off the

broken pipeline. The explosion killed Ojeda whose body was later found more than 100 feet from the bulldozer. The explosion was seen from 10 miles away and caused a loud bang that was heard five and a half miles away.

The Sandrinis' house was about 1,000 feet from the explosion. Sandrini's wife was about to sit in the bathroom and was knocked down to the floor when the explosion occurred. All the screens were knocked off the front of the Sandrinis' house.

The Ruckmans' house was approximately 200 feet from the explosion. Gloria, 17-day-old Young Robert, and Gloria's mother, Amalia Leal, were inside the house when the explosion occurred. The explosion caused the house to catch on fire. The rooms in the house turned orange, the windows shattered, and the floor shook. Gloria ran with Young Robert to Amalia in the kitchen and told Amalia there had been an explosion. Gloria and Amalia ran around the house trying to find a place to shelter. Amalia opened the front door, and saw the front porch was on fire. Gloria wrapped Young Robert in a fire-retardant jacket[6] and the three left the house through the kitchen door.

When Gloria and Amalia got outside the house, the trees, Gloria's car, and towels on the clothesline were on fire. As they headed toward the house's gate, Gloria fell to the ground with Young Robert but managed to hold onto him. Both Amalia and Gloria were burning from the fire as they fled. They crossed the street, ran into a field, and flagged down a truck driver. The truck driver asked a firefighter up the road what they should do and was told an ambulance was already on the way. Amalia, Gloria, and Young Robert were transported to the hospital by ambulance.

---

ground and led to an evacuation of nearby schools but did not cause an explosion. BND was working for Ag-Wise during this line strike and Kuykendall was aware of the strike before hiring BND to work on the property. BND also struck a Southern California gas line in 2014.

[6] Robert had a fire-retardant jacket from working as a wildland firefighter when he was in college.

**B.** *The injuries.*

Gloria had burns to 25 percent of her total body surface area and was in the hospital for 74 days. There were second and third degree burns to her face, both shoulders, back, both forearms, both hands, and bilateral lower legs, as well as fourth degree burns to her Achilles tendon, calves, and behind the knee area. She underwent eight surgeries while in the hospital. The initial surgeries were to remove unhealthy tissue. Additional surgeries involved skin grafting using Gloria's own healthy tissue as well as cadaver skin. Gloria was given high-potency pain medications including a combination of Versed and morphine. Clumps of her hair fell out. She received approximately 100 to 125 steroid injections. Gloria wanted to continue breastfeeding Young Robert while in the hospital but was told to stop pumping her milk because her body needed the energy to grow skin. This was difficult for Gloria, but she stopped pumping so she could get better and go home. Gloria took a few oxycodone after she left the hospital to help with the pain while she did hydrotherapy[7] at home but took less and less medication because she wanted to work towards not needing it. Gloria did not want to do certain activities for fear her skin could get infected because the skin over her Achilles tendon took time to close. It was hard for Gloria when she returned home to see that Young Robert wanted his father when he cried because Robert had cared for the baby while she was in the hospital.

Amalia's burn injuries were less severe than Gloria's. She was hospitalized for 42 days to treat second and third degree burns to her buttocks, back, shoulders, calves, thighs, and hands. Amalia underwent four surgeries in the hospital to remove unhealthy tissue and for skin grafting. Gloria and Amalia would see each other in the hospital on the way to hydrotherapy, a treatment Amalia described as so painful that painkillers were

---

[7] Hydrotherapy treatment involves unwrapping the bandages over the burned area, cleaning the area including clearing off dead skin, and then rewrapping the bandages.

not enough. It was difficult for Amalia to use the bathroom while in the hospital because she could not sit due to the burns on her bottom and thighs. It embarrassed her that her husband had to wipe her. At one point, one of Amalia's legs was so swollen there was a possibility she would have to lose that leg. She was left with significant textural scarring on her back, buttocks, and calves. Like Gloria, she lost hair. When Amalia returned home, she and her husband slept in the same room but in different beds to avoid hurting Amalia. They were unable to be intimate for months because Amalia could not stand to be hugged due to her injuries.

Dr. Peter Grossman, a plastic and reconstructive surgeon, testified about the different degrees of burns and how painful they can be. Dr. Grossman explained that for a skin graft, the surgeon inflicts a second degree wound on the donor site where the healthy tissue is taken. He opined that Gloria's scarring could benefit from aggressive treatment including steroid injections or laser surgery. Dr. Grossman believed laser surgery could also improve Amalia's scars but only by about 10 to 30 percent and the treatment would be painful.

Dr. Corey Gonzalez is a clinical psychologist who provided treatment to Gloria and Amalia. He diagnosed both with posttraumatic stress disorder (PTSD). Dr. Gonzalez opined that their PTSD is chronic, permanent, and lifelong. Being pulled away from Young Robert at 17 days old was traumatic for Gloria. Dr. Gonzalez testified Gloria has many triggers including gas lines, the smell of smoke, fire, and loud noises. Animals are also a trigger because the Ruckmans had dogs and chickens Gloria saw deceased and on fire while fleeing the house.

Gloria and Amalia were diagnosed with a traumatic brain injury. Dr. Galina Nikolskaya, a neurologist, examined Gloria and Amalia and reviewed their brain MRI studies. She concluded they sustained a brain injury from the explosion.

Young Robert was not burned by the fire because he was shielded by Gloria and the fire-retardant jacket. But when Young Robert was between six months to a year old,

Robert and Gloria noticed his vocabulary was really limited compared to other children his age. The Ruckmans also noticed Young Robert had an aversion to loud noises. Noises like Robert cheering while watching sports, the sound of a drill, or a siren would cause Young Robert to cry uncontrollably. Loud noises make Young Robert freeze and he had to know the noise's source. This reaction to noises continued when Young Robert began attending school. He would fixate on new noises. Young Robert had difficulty with his gait and did not take his first step until he was 15 months old. His delayed speech development became more obvious when the Ruckmans saw their subsequent two children seemed to develop verbal and conversational skills at a much younger age.

The Ruckmans had Young Robert medically evaluated. His speech and fine motor skills were delayed. A pediatrician concluded in 2017 he had an unspecified developmental disorder in speech and language. Autism and hearing loss were both ruled out, but he was diagnosed with an expressive language disorder in 2018. Young Robert qualified for individualized family services related to his delayed development. He works regularly with an occupational therapist, and has also had physical therapy, and speech and language therapy.

Dr. Kimberly Lakes, a neuropsychologist, evaluated and tested Young Robert several times starting when he was five years old. She observed his difficulty doing anything with a pencil and hyperacuity to noises in the background. Dr. Lakes opined that Young Robert had sustained a traumatic brain injury based on deficits in his expressive and receptive vocabulary, as well as his fine motor skills. She further opined he has a neurocognitive disorder. Dr. Lakes expects Young Robert's deficits in language, motor skills, and auditory attention will continue throughout his life. While he will continue to learn, grow, and develop, he will need extra support, repetition, and practice. Young Robert's IQ test scores showed however that he is in pretty good shape from an intellectual standpoint. Dr. Lakes testified Young Robert should be able to go to college and get a good job.

8.

Rami Hashish, Ph.D., a biomechanics expert in causation for brain injuries, opined that Young Robert's brain injury resulted from the explosion, shaking while Gloria was running, Gloria's fall, and smoke inhalation.

Young Robert does alright academically, but not as well socially. He is unable to connect with his peers. Dr. Nikolskaya opined that his ongoing abnormalities are a result of the blast. She testified life for him will be more difficult than a standard kid and he would need a lot of support.

## II. The Complaint and Pretrial Proceedings.

The Ruckmans and Leals filed a personal injury lawsuit against multiple defendants in December 2015. In the operative third amended complaint filed on March 6, 2017, Gloria, Amalia, and Young Robert (through a guardian ad litem) sought recovery of damages for their injuries. Robert, Gloria's husband, and Gildardo Leal, Amalia's husband, made loss of consortium claims.[8] The named defendants included BND, Jeff Alexander, PG&E, Ag-Wise, and Wildwood. The complaint alleged causes of action for general negligence, premises liability, and strict liability. According to the first cause of action for general negligence, Ag-Wise breached its duty to plaintiffs "by failing to exercise care when it hired, controlled, retained, entrusted, permitted, authorized, allowed, directed, ordered, and/or instructed" BND to excavate the soil on the property. The complaint further alleged Wildwood and Ag-Wise were strictly and/or vicariously liable based on theories of peculiar risk, nondelegable duty, and ultrahazardous activity. The premises liability claim was alleged solely against Wildwood as the property owner.[9]

On June 6, 2018, Wildwood filed a motion for summary judgment on three

---

[8]    Though the operative complaint sought economic damages related to plaintiffs' injuries and property damage, plaintiffs ultimately waived economic damages and claimed only noneconomic damages.

[9]    In May 2018, Ag-Wise filed a cross-complaint against Oasis. Oasis settled with plaintiffs before trial.

grounds: (1) Wildwood was not vicariously liable for the negligence of independent contractors or subcontractors; (2) plaintiffs' premises liability claim fails because the undisputed facts show Wildwood did not breach any duty owed to plaintiffs; and (3) plaintiffs' strict liability claim fails as a matter of law because digging, excavating and/or ripping of agricultural land is not an ultrahazardous activity.

On September 24, 2018, the trial court granted Wildwood's motion for summary judgment in full. The court concluded in relevant part Wildwood could not, as a matter of law, be vicariously liable for the negligent acts or omissions of Ag-Wise, BND or any other defendant. Judgment was entered in favor of Wildwood.

Plaintiffs appealed the judgment in favor of Wildwood. In a nonpublished opinion, *Ruckman v. Wildwood Farms, LLC* (June 1, 2021, F078655) [nonpub. opn.] (*Ruckman I*), we reversed and remanded for the trial court to deny Wildwood's motion for summary judgment but grant summary adjudication on all causes of action other than peculiar risk.[10] We were unable to conclude Wildwood could not be vicariously liable under the peculiar risk theory as a matter of law because the issue remained a factual question for the trier of fact based on the showing made. (*Ibid.*) We also found there remained a triable issue of fact as to whether the accident was caused by collateral negligence. (*Ibid.*) After the remittitur, Wildwood settled with plaintiffs for $20 million.

## III. The Trial and Jury Verdict.

Trial commenced on June 24, 2022. Shortly after trial began, PG&E reached a settlement with plaintiffs.[11] The trial continued through August. On August 31, 2022, the parties finished their closing arguments, the trial court gave final instructions to the

---

[10] This matter came before this court in *Ruckman I* and again in *Ruckman v. Ag-Wise Enterprises, Inc.* (Aug. 29, 2024, F084927) [nonpub. opn.]. Our opinion in *Ruckman I* is contained in Ag-Wise's appendix and is discussed as relevant to the issues raised in this appeal.

[11] The amount of PG&E's settlement was not disclosed because the settlement agreement was confidential.

jury, and the jury began deliberating.

The jury reached a verdict on September 2, 2022. The special verdict form provided to the jury asked in relevant part: "Did Ag-Wise Enterprises, Inc. retain control over any part of the work to be done by Big N Deep?" (Bold and capitalization omitted.) The jury answered yes 10 to two.[12] The jury also agreed nine to three that Ag-Wise failed to exercise control with reasonable care and Ag-Wise's negligence was a substantial factor in causing injury to plaintiffs. The jury unanimously found BND and PG&E were negligent, but Oasis was not. The jury split allocation of liability as follows: 50 percent to BND, 40 percent to PG&E, and 10 percent to Ag-Wise. The jury awarded the following noneconomic damages: $17 million for past loss and $13 million for future loss to Gloria; $10 million for past loss and $8 million for future loss to Amalia; $4 million for past loss and $21 million for future loss to Young Robert; $300,000 for past loss and $100,000 for future loss to Robert, Gloria's husband; and $150,000 for past loss and $100,000 for future loss to Gildardo, Amalia's husband.[13]

## IV. Judgment and Posttrial Proceedings.

On October 12, 2022, the trial court entered judgment against BND and Ag-Wise. The court found as a matter of law that Ag-Wise was vicariously liable for BND's negligence. The court further found Ag-Wise and BND were entitled to a $20 million offset based upon Wildwood's pretrial settlement.

The trial court denied in part and granted in part Ag-Wise's motion to tax (or strike) plaintiffs' costs. The court awarded costs to plaintiffs including expert witness

---

[12]   Though the special verdict form indicates the jury answered yes to this question by 11 to one, the trial court's polling of the jurors showed the jury answered yes by ten to two. Either result was sufficient for three-fourths of the jury. (*Keener v. Jeld-Wen, Inc.* (2009) 46 Cal.4th 247, 255 [sufficient in civil cause if at least nine of 12 jurors arrive at special verdict]; Cal. Const., art. I, § 16; § 618.)

[13]   The jury unanimously agreed on the amounts for plaintiffs' damages awards except Young Robert's award which had a vote of nine to three.

fees in the amount of $317,813.06 pursuant to section 998 and 10 percent interest to be applied to the $24,190,000 judgment against Ag-Wise pursuant to Civil Code section 3291.

Ag-Wise moved for a new trial on two grounds: (1) plaintiffs' counsel engaged in pervasive and prejudicial misconduct; and (2) the $73 million award for noneconomic damages is excessive. The trial court denied Ag-Wise's motion.

Ag-Wise timely appealed the judgment and postjudgment cost order.[14]

## DISCUSSION

### I. Claims of Instructional Error.

Ag-Wise raises two instructional error claims: (1) the trial court erroneously instructed the jury on a retained control theory of liability where no evidence supported that theory and the court's "homemade" instruction was legally inaccurate; and (2) the court erroneously refused to instruct the jury on the collateral negligence exception to the peculiar risk doctrine

#### A. *Standard of review.*

The propriety of a jury instruction is a question of law we review de novo. (*Cristler v. Express Messenger Systems, Inc.* (2009) 171 Cal.App.4th 72, 82.) "A trial court has the duty to instruct the jury on the law applicable to the facts of the case." (*Collins v. Navistar, Inc.* (2013) 214 Cal.App.4th 1486, 1500.) "A party is entitled upon request to correct, nonargumentative instructions on every theory of the case advanced by him [or her] which is supported by substantial evidence." (*Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 572.) " 'Although a party is entitled to instructions on his [or her] theory of the case, if reasonably supported by the pleadings and the evidence, instructions must be properly selected and framed. The trial court is not required to give

---

**14** We ordered the two appeals (case Nos. F086037 and F086187) consolidated under F086037 pursuant to the parties' stipulation to consolidate Ag-Wise's appeals.

12.

instructions [that] are not correct statements of the law or are incomplete or misleading [citation].' " (*Norman v. Life Care Centers of America, Inc.* (2003) 107 Cal.App.4th 1233, 1242.)  We review "the record in the light most favorable to the party proposing the instruction to determine whether it was warranted by substantial evidence." (*Alamo v. Practice Management Information, Corp.* (2013) 219 Cal.App.4th 466, 475.)  "A judgment may not be reversed for instructional error in a civil case 'unless, after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice.' " (*Soule*, at p. 580.)

> **B.**    ***Substantial evidence supported instructing the jury on the retained control exception and the trial court's instruction accurately stated the law.***

### 1.    Additional procedural background.

Before closing arguments, the trial court discussed proposed jury instructions regarding plaintiffs' claim against Ag-Wise.  The court observed that plaintiffs' theories of recovery "to one degree or another, all seem to" fall under the peculiar risk doctrine.  But the court noted section 414 of Restatement Second of Torts appears to provide an additional basis for liability "where there's retained control and that control is not exercised with reasonable care."  The court proposed giving an instruction on this theory of negligence against Ag-Wise.  Ag-Wise argued against the proposed instruction and asserted there was no evidence to support retention of control.  The court responded it had not concluded as a matter of law that Ag-Wise retained control but believed there was enough evidence for the jury to decide the issue.

Ag-Wise argued to the trial court that if an instruction on the retained control theory was to be given, the jury must be instructed there was an affirmative act by Ag-Wise.  Ag-Wise conceded it could not find a case showing an affirmative act is required under a retained control theory involving a third-party plaintiff.  The court observed that

the *Privette*[15] line of cases noted by Ag-Wise addresses a hirer's liability with respect to the independent contractor's employees and wrestle with the fact that workers' compensation already provides a remedy to the employees. The court further observed that a hirer could retain some liability to a contractor's employee by an affirmative act or omission but did not see those cases as directly on point to the instant case. The court had "yet to be convinced that Restatement Second of Torts section 414 is not the law in California."

Ag-Wise argued the retained control theory was never proposed by plaintiffs and was being imposed on Ag-Wise by the trial court. The court disagreed, stating plaintiffs' "theory from Day 1 was that [Ag-Wise] was negligent in the way that they dealt with Big N Deep."

The trial court instructed the jury on the required elements plaintiffs must prove under a retained control theory of liability as follows:

> "One, that Ag-Wise Enterprises retained control of any part of the work to be done by Big N Deep; [¶] Two, that Ag-Wise Enterprises failed to exercise control with reasonable care; [¶] Three, that Gloria Ruckman, Young Robert Ruckman, Amalia Leal, Robert Ruckman, and Gil Leal were harmed; [¶] And, four, that Ag-Wise Enterprises, Inc.'s negligence was a substantial factor in causing Gloria Ruckman, Young Robert Ruckman, Amalia Leal, Robert Ruckman, and Gil Leal's harm. [¶] Negligence is the failure to use reasonable care to prevent harm to oneself or to others. A person can be negligent by acting or failing to act. A person is negligent if that person does something that a reasonably careful person would not do in the same situation or fails to do something that a reasonably careful person would do in the same situation. You must decide how a reasonably careful person would have acted in Big N Deep and/or Ag-Wise Enterprises, Inc.'s situation."

### 2. Legal background.

"It is a fundamental principle of tort law that defendants are liable for injuries caused by their failure to exercise reasonable care." (*Myers v. Quesenberry* (1983)

---

[15] *Privette v. Superior Court* (1993) 5 Cal.4th 689 (*Privette*).

14.

144 Cal.App.3d 888, 891.)  However, " '[t]here must be a legal duty to exercise care under the circumstances, owed to the person injured, and a breach of that duty must be the proximate cause of the resulting injury.  [Citations.]  Thus, the determination that a duty of care exists is an essential precondition to liability founded on negligence.' " (*Ibid.*; *John B. v. Superior Court* (2006) 38 Cal.4th 1177, 1188 ["To prevail in an action for negligence, the plaintiff must demonstrate that the defendant owed a duty to the plaintiff, that the defendant breached that duty, and that the breach proximately caused the plaintiff's injuries"].)

When a party is injured by an independent contractor's negligence and seeks liability against the hirer of the contractor, the threshold question is whether the hirer owed a duty of care to the injured party.  "At common law, a person who hired an independent contractor generally was not liable to third parties for injuries caused by the contractor's negligence in performing the work." (*Privette*, *supra*, 5 Cal.4th at p. 693.) "Because the hirer presumptively delegates to the independent contractor the authority to determine the manner in which the work is to be performed, the contractor also assumes the responsibility to ensure that the worksite is safe, and the work is performed safely." (*Gonzalez v. Mathis* (2021) 12 Cal.5th 29, 41 (*Gonzalez*).)  "This presumption is grounded in two major principles: first, that independent contractors by definition ordinarily control the manner of their own work; and second, that hirers typically hire independent contractors precisely for their greater ability to perform the contracted work safely and successfully." (*Sandoval v. Qualcomm Incorporated* (2021) 12 Cal.5th 256, 269 (*Sandoval*).

There are, however, "so many exceptions to this general rule of nonliability that ' " 'the rule is now primarily important as a preamble to the catalog of its exceptions.' " ' " (*Privette*, *supra*, 5 Cal.4th at p. 693.)  Courts have "diluted the original, plain vanilla common law rule in various ways depending on the identity of the injured party.  Where an injury befalls a hapless third party, the paramount concerns have been

about ensuring victim compensation. Lest the victim be limited to suing an insolvent contractor, courts have extended various theories of direct and vicarious liability so the injured third party can recover from the hirer. [Citation.] As between an unrelated third party and a hirer, courts have preferred to let the loss lie with the party for whose benefit the contracted work was undertaken." (*Sandoval*, *supra*, 12 Cal.5th at p. 269.) Conversely, if the injured party is an employee of the independent contractor, the courts have concluded "it is ordinarily unfair to let a contract worker recover from the hirer for the contractor's negligence." (*Id.* at p. 270.)

Here, plaintiffs are not employees of the independent contractor. Because the *Privette* doctrine provides that a hirer is generally not liable for injuries sustained by an independent contractor or its workers while on the job, *Privette* and its progeny focus on delineating the circumstances under which an independent contractor's employee may sue the hirer in tort for a work-related injury. (E.g., *SeaBright Ins. Co. v. U.S. Airways, Inc.* (2011) 52 Cal.4th 590, 594 [*Privette* bars liability where the hirer failed to comply with workplace safety requirements]; *Kinsman v. Unocal Corp.* (2005) 37 Cal.4th 659, 664 [landowner who withholds critical information about a concealed hazard on the property from the independent contractor may be liable to employee]; *Camargo v. Tjaarda Dairy* (2001) 25 Cal.4th 1235, 1238 [*Privette* bars employee's cause of action against the hirer for negligent hiring]; *Toland v. Sunland Housing Group, Inc.* (1998) 18 Cal.4th 253, 267 (*Toland*) [the hirer has no obligation to take special precautions to protect an independent contractor's employees].) *Privette* and its progeny are thus not directly applicable given the facts of this case. However, case law discussing the retained control exception to the *Privette* doctrine is relevant to the issues raised on appeal.

Specifically, in *Hooker v. Department of Transportation* (2002) 27 Cal.4th 198, our Supreme Court addressed if *Privette* bars an employee's cause of action against a hirer for negligent exercise of retained control under section 414 of Restatement Second of Torts. Section 414 states: "One who entrusts work to an independent contractor, but

16.

who retains the control of any part of the work, is subject to liability for physical harm to others for whose safety the employer owes a duty to exercise reasonable care, which is caused by his failure to exercise his control with reasonable care." There was impliedly no question a hirer may have tort liability to innocent third parties under the retained control exception embodied in section 414. (*Hooker*, at p. 206.) Rather, the question in *Hooker* was if the "others" referenced in section 414 encompasses an independent contractor's employees. (*Hooker*, at p. 206.) The court reasoned that "because the liability of the contractor, the person primarily responsible for the worker's on-the-job injuries, is limited to providing workers' compensation coverage, it would be unfair to impose tort liability on the hirer of the contractor merely because the hirer retained the ability to exercise control over safety at the worksite." (*Id.* at p. 210.) Instead, in fairness, "the imposition of tort liability on a hirer should depend on whether the hirer *exercised* the control that was retained in a manner that *affirmatively* contributed to the injury of the contractor's employee." (*Ibid*.) In those circumstances, an employee may have an action against the hirer under section 414 because the "tort liability of the hirer is warranted by the hirer's own affirmative conduct." (*Hooker*, at p. 214.)

Nearly 20 years later, our Supreme Court revisited *Hooker* in *Sandoval*. The *Sandoval* court reiterated that under *Hooker*, an employee "must establish not only that the hirer retained control over the contracted work, but also that the hirer actually exercised that retained control in a manner that affirmatively contributed to the contract worker's injury." (*Sandoval*, *supra*, 12 Cal.5th at p. 274.) The court elucidated *Hooker*'s key concepts including, as relevant here, retained control: "A hirer 'retains control' where it retains a sufficient degree of authority over the manner of performance of the work entrusted to the contractor. This concept simply incorporates [section 414 of] Restatements' theory of retained control: Against a backdrop of no hirer duty respecting the manner of performance of work entrusted to a contractor, the Restatements provide that a hirer who retains control over any part of that work owes others a duty of

17.

reasonable care respecting the hirer's exercise of that retained control. … Furthermore, a hirer's authority over the contracted work amounts to retained control only if the hirer's exercise of that authority would sufficiently limit the contractor's freedom to perform the contracted work in the contractor's own manner." (*Id.* at pp. 274–275.)

The *Sandoval* court's discussion of retained control draws from the comments by the drafters of the Restatement Second of Torts to section 414. One comment states: "If the employer of an independent contractor retains control over the operative detail of doing any part of the work, he is subject to liability for the negligence of the employees of the contractor engaged therein, under the rules of that part of the law of Agency which deals with the relation of master and servant." (Rest.2d Torts, § 414, com. a, p. 387.) The drafters further commented that "for the rule stated in this Section to apply, the employer must have retained at least some degree of control over the manner in which the work is done. It is not enough that he has merely a general right to order the work stopped or resumed, to inspect its progress or to receive reports, to make suggestions or recommendations which need not necessarily be followed, or to prescribe alterations and deviations. Such a general right is usually reserved to employers, but it does not mean that the contractor is controlled as to his methods of work, or as to operative detail. There must be such a retention of a right of supervision that the contractor is not entirely free to do the work in his own way." (*Id.*, at com. c, p. 388.)

### 3. Sufficient evidence supported instructing the jury on the retained control exception.

Ag-Wise contends the trial court erred in giving the retained control instruction because undisputed evidence established that Ag-Wise did not control how BND performed the soil ripping. We disagree. Though Ag-Wise argues the evidence is undisputed it told BND what to do, not how to do it, the evidence reveals otherwise.

Kuykendall, Ag-Wise's president, and Alexander, BND's proprietor, met twice to discuss the area to be excavated before BND began its work. The first meeting was in

18.

Ag-Wise's field office. Kuykendall and Alexander discussed leaving a wide buffer zone around the pipeline and not operating over the pipeline at night. Ag-Wise marked other lines on the property it did not want BND to hit. Kuykendall and Alexander met a second time out in the field to discuss the same topics. An Ag-Wise employee gave Martin, a BND employee, a tour of the area of the property that was to be excavated before Martin started deep ripping.

Up until the day of the explosion, BND would operate the excavator up to the buffer zone, lift the shank, travel over the pipeline, and then drop back down. The decision to operate this way came from Ag-Wise. Kuykendall told Alexander to rip the property in a north to south direction though Kuykendall knew ripping this direction meant the excavator would cross the pipeline.[16] Kuykendall wanted Alexander to rip the soil to a minimum depth of five feet. Kuykendall told Alexander to wait until Oasis was finished farming the sod before excavating part of the property. While BND was ripping the soil, Kuykendall or another Ag-Wise supervisor visited the property almost every day to confirm BND was ripping to Ag-Wise's desired depth. The day before the explosion, Ag-Wise notified Alexander the sod farming was done.

Ag-Wise directed BND to rip the field in a particular direction, to a minimum depth of five feet, and how to operate the excavator when going over the pipeline. Ag-Wise regularly came by the property during the excavation work to ensure BND was ripping the soil to its desired depth. These facts could reasonably lead the trier of fact to conclude BND was not entirely free to do the work in its own way. Because there was sufficient evidence for the jury to decide if Ag-Wise retained control over BND's work,

---

[16] Kuykendall also testified he and Alexander discussed ripping the soil parallel to the pipeline. During a portion of Alexander's videotaped deposition played for the jury, Alexander denied Kuykendall told him to have the ripper go parallel to the pipeline. We view the record in the light most favorable to the party proposing the instruction. (*Alamo v. Practice Management Information, Corp.*, *supra*, 219 Cal.App.4th at p. 475.)

19.

the trial court did not err by instructing the jury on this theory of liability.[17]

Ag-Wise argues sole responsibility to safely perform the work was delegated to BND because BND was responsible for obtaining the permits for the excavation and had the expertise to perform the work. That it was BND's obligation to secure the necessary permits for the excavation does not preclude a finding that Ag-Wise retained control over the way BND performed the work. The question is if the hirer retained "control over the manner in which the work is done," not if the hirer specifically retained control over safety conditions at the worksite. (Rest.2d Torts, § 414, com. c, p. 388; see *Sandoval*, *supra*, 12 Cal.5th at pp. 275–276 [pivotal question is whether the hirer retained control over the manner of performing the work, not over safety conditions at the worksite].)

We reject Ag-Wise's contention that plaintiffs' expert essentially ruled out a finding that Ag-Wise retained control. Dr. Richard Cavaletto, plaintiffs' agricultural expert, testified about steps Ag-Wise could have taken to avoid the accident. While Dr. Caveletto said Ag-Wise could have done certain things to help ensure BND was taking the necessary steps to minimize a strike, he also said Ag-Wise was " 'not doing the excavation' " and " 'didn't have control over the actual work that was being done.' " To the extent Dr. Cavaletto's testimony indicates Ag-Wise did not retain control over BND's work, this contrasts with the evidence discussed above that Ag-Wise directed BND's work. In other words, Dr. Cavaletto's testimony merely presented conflicting evidence on whether Ag-Wise retained control over BND's work. Because the evidence reasonably supported a finding Ag-Wise retained control over BND's work, the trial

---

17    The evidence Ag-Wise retained control over BND's work is primarily based on the parties' conduct because there was no executed written contract between Ag-Wise and BND regarding the excavation work on the property. (Cf. *Khosh v. Staples Construction Co., Inc.* (2016) 4 Cal.App.5th 712, 717 [contract between hirer and independent contractor created triable issue of fact as to retained control].) Although Alexander signed a written contract for performing the work for Ag-Wise after the explosion, the contract was not signed by Ag-Wise.

20.

court did not err by instructing the jury on this theory of liability.

**4.  The trial court properly instructed the jury on the retained control exception.**

Ag-Wise contends even if the evidence supports the retained control exception, the trial court's particular instruction was erroneous because the court improperly copied from section 414 of Restatement Second of Torts in fashioning its instruction.  Relying primarily on CACI No. 1009B, Ag-Wise claims the hirer must be shown to have retained "some" control over part of the work and the hirer's negligent exercise of retained control must affirmatively contribute to the plaintiff's harm.  Ag-Wise misapprehends the showing necessary to impose liability on the hirer under the retained control exception where the plaintiff is *not* the independent contractor's employee.

"The liability of a landowner [or hirer] stemming from the negligence of an independent contractor begins with a basic question—who was injured?"  (Miller & Starr, Cal. Real Estate (4th ed. 2024) § 19:57.)  As discussed above, there are multiple exceptions to the general rule of nonliability for the hirer depending on the identity of the injured party.  For the retained control exception to apply, the heart of the inquiry is whether the hirer ineffectively delegated its tort duties to the independent contractor by retaining control over the contractor's work.  But as the *Sandoval* court observed, the required showing to impose liability under this exception differs depending on the injured party's identity:  "What we decided in *Hooker* was that, *even if hirers may owe unrelated third parties a retained control duty based on retained control alone*, hirers owe the contract workers a retained control duty only with something more."  (*Sandoval*, *supra*, 12 Cal.5th at p. 276, italics added.)  Unlike an unrelated third party, an employee "must prove that the hirer *both* retained control *and* actually exercised that retained control in such a way as to affirmatively contribute to the injury."  (*Ibid.*)  The *Sandoval* court distinguished " 'retained control,' which is satisfied where the hirer retains merely the *right* to become so involved, [from] 'actual exercise' [which] requires that the hirer in

fact involve itself, such as through direction, participation, or induced reliance." (*Ibid.*, fn. omitted.) " 'Affirmative contribution' means that the hirer's exercise of retained control contributes to the injury in a way that isn't merely derivative of the contractor's contribution to the injury. [Citation.] Where the contractor's conduct is the immediate cause of injury, the affirmative contribution requirement can be satisfied only if the hirer in some respect induced — not just failed to prevent — the contractor's injury-causing conduct." (*Id.* at p. 277.) It is not enough that the hirer retained control over the contracted work if the plaintiff is an employee—something more must be shown to find the hirer ineffectively delegated its tort duties to the independent contractor. (E.g., *McKown v. Wal-Mart Stores, Inc.* (2002) 27 Cal.4th 219, 225 [the hirer affirmatively contributed to the employee's injury where the hirer requested the independent contractor's employees use unsafe equipment]; *Kinney v. CSB Construction, Inc.* (2001) 87 Cal.App.4th 28, 33–36 (*Kinney*) [there was sufficient evidence the hirer retained control for liability to a third party but liability to contractor's employee required showing affirmative conduct by the hirer].)

As alluded to above, important policy reasons support limiting the circumstances for holding the hirer liable for a contract employee's injury. But where the plaintiff "is a complete stranger" to the employment relationship, "the injured person has no other certain remedy, the immediate employer is not immune from civil liability, and the hirer, if held liable, is presumptively entitled to equitable indemnity from the immediate employer. Holding both hirer and employer liable presumably provides both with a powerful incentive to act with due care towards neighbors, bypassers, and visitors to the site. Such strangers to the work appear to fall squarely within the original rationale for the 'retained control' doctrine: they have no assured remedy from any other source; if the subcontractor is primarily responsible, the hirer is entitled to equitable indemnity; it is fair to shift the burden of the injury from the innocent stranger to the beneficiary of the work; and the imposition of liability encourages the hirer to exercise the retained control

22.

so as to make the operation safe for third parties." (*Kinney*, *supra*, 87 Cal.App.4th at pp. 38–39, some capitalization removed.)

In sum, an independent contractor's employee and an innocent bystander carry different burdens to impose liability on the hirer under the retained control exception. While an employee must show the hirer negligently exercised retained control in a way that affirmatively contributed to the injury, an innocent bystander need not show the hirer affirmatively contributed to their injury. Instead, the hirer may be liable to an innocent bystander simply by retaining control over the independent contractor's work. And "as a matter of common law negligence, it would be enough that the hirer's exercise of its retained control was a *substantial factor* in *bringing about* the" bystander's injury. (*McCarty v. State of California Department. of Transportation* (2008) 164 Cal.App.4th 955, 977; *Ortega v. Kmart Corp.* (2001) 26 Cal.4th 1200, 1205 [the defendant's breach of its duty to the plaintiff must be a substantial factor in bringing about the plaintiff's injury]; see *Sandoval*, *supra*, 12 Cal.5th at p. 278 ["affirmative contribution is a different sort of inquiry than substantial factor causation"].)[18] Therefore, and in contrast with an

---

[18] Though issued before *Hooker* (but cited with approval in *Hooker*), *Kinney* illustrates the different showing when the injured party is an innocent bystander rather than an employee. The plaintiff in *Kinney* sued the general contractor after he was injured by a fall from scaffolding while employed by the independent contractor. (*Kinney*, *supra*, 87 Cal.App.4th at pp. 29–30.) On appeal of summary judgment in favor of the general contractor, the court of appeal found there was sufficient evidence to raise a triable issue of fact about whether the general contractor retained a sufficient degree of control because: (1) the general contractor had a site superintendent who had the right to take whatever appropriate measures to eliminate or abate any safety hazards, whether created by the general contractor or the subcontractor; (2) the general contractor could suspend work if there was a disagreement over safety procedures; (3) the general contractor had the final say in resolving any disagreement with the subcontractor over safety procedures; and (4) the general contractor could stop the subcontractor's work if the subcontractor was working without adequate fall protection. (*Id*. at p. 33.) The court had "no doubt that this evidence would be sufficient to preclude summary judgment if the underlying claim against [the general contractor] rested on [the independent contractor's] creation of a hazard that injured a stranger to the construction work, such as a neighbor, a bypasser, or perhaps a person lawfully on the premises for another purpose." (*Ibid*.) But

23.

employee, an innocent bystander asserting a negligence claim against the hirer under the retained control exception must show: (1) the hirer retained control over any part of the contractor's work (duty); (2) the hirer failed to exercise that control with reasonable care (breach); and (3) the hirer's negligence was a substantial factor in causing the bystander's injury (causation).

Here, plaintiffs were innocent bystanders injured while BND was performing work on the adjoining property as an independent contractor for Ag-Wise. Because none of the plaintiffs was an employee of BND, plaintiffs were not required to show Ag-Wise negligently exercised retained control over BND's work in a manner that affirmatively contributed to their injuries. The jury was thus correctly instructed on the necessary elements for plaintiffs' negligence claim against Ag-Wise under the retained control exception.[19]

For these reasons, the use of parts of CACI No. 1009B advocated by Ag-Wise would have misinstructed the jury on the applicable law to the facts of this case. CACI No. 1009B provides the pattern jury instruction for "Liability to *Employees* of Independent Contractors for Unsafe Conditions—Retained Control." (Italics added.) The directions for using CACI No. 1009B expressly state the "instruction is for use if a

---

the court concluded this liability did not extend to an injured employee in the absence of affirmative conduct by the general contractor, which the plaintiff had failed to show. (*Id.* at p. 36–39.)

[19] The "jury instructions approved by the Judicial Council are the official instructions for use in the state of California." (Cal. Rules of Court, rule 2.1050(a).) While "[u]se of the Judicial Council instructions is strongly encouraged," when "the Judicial Council jury instructions does not contain an instruction on a subject on which the trial judge determines that the jury should be instructed, or when a Judicial Council instruction cannot be modified to submit the issue properly, the instruction given on that subject should be accurate, brief, understandable, impartial, and free from argument." (*Id.*, rule 2.1050(f).) It is thus permissible where the Judicial Council jury instructions do not provide an instruction on a subject for the trial court, as the court did here, to create its own instruction.

24.

dangerous condition on property causes injury to an *employee* of an independent contractor hired to perform work on the property." (Judicial Council of Cal. Civil Jury Instructions Calif. CACI No. 1009B (2025) Directions for Use, p. 659, italics added.) Consistent with *Hooker* and *Sandoval*, CACI No. 1009B requires the plaintiff employee prove the defendant's "negligent exercise of [his/her/*nonbinary pronoun*/its] retained control affirmatively contributed to [*name of plaintiff*]'s harm."[20] Inclusion of this element in the jury instructions would have inaccurately stated plaintiffs' burden of proof. The trial court thus properly refused Ag-Wise's request to instruct the jury Ag-Wise must have committed an affirmative act.

Ag-Wise cites no authority, nor are we aware of any, supporting its assertion the retained control exception applies only where the hirer controls "some" rather than "any" part of the contractor's work. Section 414 of the Restatement Second of Torts refers to "any control." No existing case law quantifies the amount of control necessary to impose liability on the hirer, presumably due to the inquiry's fact-driven nature. Even case law discussing the retained control exception in the more circumscribed circumstances where the plaintiff is an employee primarily use the term "any," but sometimes refer to "some" control with no apparent distinction being drawn between the two. (E.g., *Gonzalez*, *supra*, 12 Cal.5th at pp. 46–47 [the hirer must "exercise its retained control over any part of the contracted-for work"]; *Sandoval*, *supra*, 12 Cal.5th at p. 283 [to establish a duty under *Hooker* the plaintiff must establish "the hirer retained control over the manner of performance of some part of the work entrusted to the contractor"]; *Collins v. Diamond Generating Corporation* (2024) 107 Cal.App.5th 1162, 1175 [the "hirer owes a duty to a contract worker if the hirer retains control over any part of the work"]; *Degala v. John*

---

[20] The *Sandoval* court concluded a former version of CACI No. 1009B did not adequately instruct the jury on the necessary elements of a *Hooker* claim. (*Sandoval*, *supra*, 12 Cal.5th at pp. 282–283.) CACI No. 1009B was subsequently revised by the Judicial Council.

*Stewart Co.* (2023) 88 Cal.App.5th 158, 162 [*Hooker* exception "applies when the hirer retains control over any part of the contractor's work"].) While CACI No. 1009B states the hirer must have "retained some control," we have already concluded this instruction has no application here.[21] In the absence of authority reflecting the jury instruction's reference to "any control" inaccurately states the law, Ag-Wise's challenge to the instruction's wording lacks merit.

### C. *The evidence did not support a collateral negligence instruction because striking the pipeline was a risk inherent in the excavation work.*

#### 1. Additional procedural background.

Ag-Wise asked the trial court to give the jury the following instruction: "Peculiar risk doctrine does not apply if the accident was caused by the ordinary mistake of Big N Deep employee Michael Ojeda. Therefore, if you determine the accident was caused by the ordinary mistake of employee Michael Ojeda carrying out Big N Deep's work, Ag-Wise is not responsible." Ag-Wise averred this instruction was taken "right from" *Ruckman I*.[22] Plaintiffs objected to the instruction.

The trial court did not consider Ag-Wise's requested instruction appropriate in this case and believed the instruction would confuse the jury. The court acknowledged collateral negligence is an exception to the peculiar risk doctrine and has been described in section 426 of the Restatement Second of Torts. But the court noted the comments to section 426 "make it pretty clear that this exception to the Peculiar Risk Doctrine where the hiring party ordinarily would be on the hook, this applies where the negligence that

[21] We have no occasion to and make no comment on whether the current version of CACI No. 1009B accurately states the law.

[22] Though we need not address the accuracy of Ag-Wise's requested instruction, we question the wisdom of Ag-Wise's use of language from *Ruckman I*. Courts have long cautioned against crafting jury instructions using language from an appellate court opinion: "Language in an appellate court opinion which may be a good statement of law or of the reasoning of the appellate court does not necessarily make a good jury instruction." (*People v. Adams* (1987) 196 Cal.App.3d 201, 204–205.)

26.

actually occurred is not really within what the hiring party could have possibly contemplated." The court observed the examples given for section 426 involve "situation[s] where the employer couldn't really have reasonably be held to have foreseen the possibility of this conduct. [¶] But this is exactly the risk that everyone contemplated when this ripping was going to happen." The court denied Ag-Wise's request to instruct the jury on collateral negligence.

### 2. Legal background.

As discussed in *Ruckman I,* the peculiar risk doctrine is one of the exceptions to the general rule of nonliability for hirers of independent contractors. "Under the peculiar risk doctrine, a person who hires an independent contractor to perform work that is inherently dangerous can be held liable for tort damages when the contractor's negligent performance of the work causes injuries to others." (*Privette*, *supra*, 5 Cal.4th at p. 691.) A peculiar risk is "neither a risk that is abnormal to the type of work done, nor a risk that is abnormally great." (*Id.* at p. 695.) "Rather, it is a special and recognizable danger inherent in the work itself, arising either from the nature or the location of the work to be done, and against which a reasonable person would recognize the necessity of taking special precautions." (*Ruckman I*, *supra*, F078655 at p. *20, citing *Privette*, at p. 695 and *Aceves v. Regal Pale Brewing Co.* (1979) 24 Cal.3d 502, 509; see also Rest.2d Torts, § 416.)

"Even when work performed by an independent contractor poses a special or peculiar risk of harm, however, the person who hired the contractor will not be liable for injury to others if the injury results from the contractor's 'collateral' or 'casual' negligence." (*Privette*, *supra*, 5 Cal.4th at p. 696.)[23] "Negligence is collateral when it involves an 'operative detail of the work, as distinguished from the general plan or

---

[23] Though collateral negligence is sometimes called "casual" negligence (Rest.2d Torts, § 426, com. a, p. 414) and the parties use both terms in their briefing, we employ the term collateral.

method to be followed.' " (*Toland, supra*, 18 Cal.4th at p. 259, quoting *Aceves v. Regal Pale Brewing Co.*, *supra*, 24 Cal.3d at p. 510.)  Case law has observed "it is often difficult to distinguish those risks that are inherent in the work from those that are collateral, and the line to be drawn between the two types of risks is 'shadowy.' " (*Privette*, at p. 696.)  The line may be drawn however by discerning if the "injuries resulted from negligence which was unusual or abnormal, creating a new risk not inherent in the work itself or in the ordinary or prescribed way of doing it, and not reasonably foreseeable by" the hirer or "caused by normal negligence which precipitated a contemplated special risk of harm which was itself" a risk posed by the work.  (*Caudel v. East Bay Mun. Utility Dist.* (1985) 165 Cal.App.3d 1, 9 (*Caudel*).)[24]

### 3.     Analysis.

Ag-Wise argues this court's holding in *Ruckman I* that there was a triable issue on the question of collateral negligence with respect to Wildwood applies equally to Ag-Wise, and the trial court thus erred in declining to instruct the jury on this exception.  In *Ruckman I*, Wildwood argued the peculiar risk doctrine was inapplicable because Ojeda still hit the pipeline despite special precautions taken and hence "the accident must have been caused by collateral negligence—that is, the result of an ordinary mistake by the worker in carrying out the operational details of the work, not an absence of special precautions."  (*Ruckman I*, *supra*, F078655 at p. *28.)  We found it appeared "a prima facie showing was made that special precautions or procedures were followed by BND in performing the work" based on "our independent review of all the papers and evidence in

---

[24]     Section 426 of the Restatement Second of Torts explains collateral negligence as follows:  "an employer of an independent contractor, unless he is himself negligent, is not liable for physical harm caused by any negligence of the contractor if [¶] (a) the contractor's negligence consists solely in the improper manner in which he does the work, and [¶] (b) it creates a risk of such harm which is not inherent in or normal to the work, and [¶] (c) the employer had no reason to contemplate the contractor's negligence when the contract was made."  (Rest.2d Torts, § 426, p. 413.)

connection with the motion for summary judgment." (*Ibid.*)  We delineated the evidence for that prima facie showing but ultimately concluded "Wildwood's showing was too equivocal, fragmentary and incomplete on the question whether the accident was in fact *caused* by collateral negligence to adequately meet its initial burden on that issue. Among other deficiencies is the following: Because BND required its worker to drive the excavation equipment perpendicularly across or over the pipeline with each pass, it appears … that the issue of the conspicuous nature (or lack thereof) of the markers and buffer zone along the length of the pipeline across this farmland would be crucial to that question.  However, Wildwood's separate statement did not provide any description or other indication of how clear, apparent or conspicuous the markers and buffer zones were.  In addition to this shortcoming in the showing made by Wildwood, we note the literal wording of Wildwood's separate statement is incomplete, doubtful or equivocal in its portrayal of the extent of the precautions taken by BND, stating among other things that BND's employees were only made aware of the '*general* location' of the pipeline, and that BND '*intended* to implement' a buffer zone surrounding the pipeline.  Also, remarkably absent from the separate statement on this point is any statement asserting the cause of the accident.  We conclude the showing by Wildwood was insufficient to shift the burden as the moving party on this issue, and a triable issue of fact remained whether the accident was caused by collateral negligence." (*Id.* at pp. *30–31.)

Ag-Wise essentially argues because this court in *Ruckman I* found there remained a triable issue of fact as to the collateral negligence exception, the trial court was obligated to instruct the jury on that exception.  This argument ignores the difference between determining if there is a triable issue of fact necessitating a trial and determining if sufficient evidence has been presented during trial to support a requested jury instruction.  Summary judgment is properly granted if there is no triable issue of fact, and the moving party is entitled to judgment as a matter of law.  (*Raghavan v. Boeing Co.* (2005) 133 Cal.App.4th 1120, 1131; § 437c, subd. (c).)  An "order denying summary

29.

judgment simply establishes the existence of *a* triable fact when the order was made. …
[It] does *not* establish the merits or legal sufficiency of either party's case." (Weil &
Brown, Cal. Practice Guide, Civil Procedure Before Trial, (The Rutter Group 2024)
¶ 10:364.)  A summary judgment motion is generally ruled upon based on all the papers
submitted and without a full evidentiary record because the very purpose of summary
judgment is to avoid an unnecessary trial.  (*Hartford Casualty Ins. Co. v. Swift
Distribution, Inc.* (2014) 59 Cal.4th 277, 286; *Aguilar v. Atlantic Richfield Co.* (2001)
25 Cal.4th 826, 843.)  In contrast, a trial court ruling on a jury instruction request has the
benefit of an ostensibly comprehensive evidentiary record elicited during trial including
any exhibits and witness testimony.  A denial of summary judgment does not mandate a
jury instruction on a previously deemed triable issue of fact that ultimately lacks
sufficient evidentiary support for the jury's consideration.  This is analogous to the
principle that "the judge at trial may direct a verdict in favor of the moving party despite
the earlier denial of summary judgment." (Civil Procedure Before Trial, *supra*,
¶ 10:364.)  What was once an issue may no longer be once all the evidence has been
presented.  Consequently, our conclusion in *Ruckman I* that collateral negligence
remained a triable issue of fact based on the record on summary judgment did not
preclude the trial court from later declining to give Ag-Wise's requested instruction.

To the extent Ag-Wise is claiming the law of the case doctrine means our holding
in *Ruckman I* that the issue of collateral negligence remained a triable issue of fact
through to the close of trial, plaintiffs correctly argue the doctrine is not applicable.
Under the law of the case doctrine, " 'the decision of an appellate court, stating a rule of
law necessary to the decision of the case, conclusively establishes that rule and makes it
determinative of the rights of *the same parties* in any subsequent retrial or appeal in the
same case.' " (*Nally v. Grace Community Church* (1988) 47 Cal.3d 278, 301, italics
added.)  The doctrine applies only when "the evidence is substantially the same."
(*People v. Boyer* (2006) 38 Cal.4th 412, 442.)  The dispute over the collateral negligence

30.

instruction was between plaintiffs and Ag-Wise, but the dispute in *Ruckman I* was between plaintiffs and Wildwood. Additionally, the evidentiary record differed between *Ruckman I* and when the trial court considered Ag-Wise's requested collateral negligence instruction.

Moreover, we are not persuaded substantial evidence supported an instruction on collateral negligence. Though Ag-Wise argues the evidence showed Ojeda raised the bulldozer's shank when he struck the pipeline, the evidence this was the explosion's cause falls in the realm of conjecture. (See *Braewood Convalescent Hospital v. Workers' Comp. Appeals Bd.* (1983) 34 Cal.3d 159, 164 [substantial evidence means evidence that is reasonable, credible, and of solid value].) Martin testified raising the shank when it hits the gas pipeline risks causing a spark and igniting the line. When Martin hit the same pipeline in 2014, he knew not to raise the shank due to this risk. Alexander believed the explosion occurred because Ojeda raised the shank when it hit the pipeline but conceded he "can't hundred percent say" that was what caused the ignition. An experienced bulldozer operator told an Occupational Safety and Health Administration investigator that he believed Ojeda was not paying attention to what he was doing and raised the shank when he hit the line. No witnesses saw what happened when Ojeda hit the pipeline, and the testimony Ojeda raised the shank offered a feasible but speculative cause for the explosion. The trial court was not obligated to instruct the jury on a theory lacking sufficient evidentiary support. (*Harb v. City of Bakersfield* (2015) 233 Cal.App.4th 606, 619.)

Ag-Wise claims Ojeda engaged in collateral negligence because he did the opposite of or was oblivious to what he was told or trained to do and cites three cases in support of this claim: *Caudel*, *Hughes v. Atlantic Pacific Construction Co.* (1987) 194 Cal.App.3d 987 (*Hughes*) and *Stark v. Weeks Real Estate* (1979) 94 Cal.App.3d 965 (*Stark*). As discussed above, what Ojeda did when he struck the pipeline remains uncertain. These cases also do not assist Ag-Wise.

In *Caudel*, the plaintiff was injured while doing excavation work at night in an area that was muddy, slick, wet, and not well lit. (*Caudel*, *supra*, 165 Cal.App.3d at p. 5.) The court concluded whether performing this type of work at night posed a peculiar risk or if the injury was caused by collateral negligence were both questions of fact for the jury. (*Id.* at pp. 7–9.) Accordingly, the court held it was error for the trial court to grant the defendant's summary judgment motion. (*Id.* at p. 10.) But the court did not posit that the issue of collateral negligence is *always* a question of fact that must be decided by the jury in every case. Because "the 'peculiar risk' doctrine depends upon the particular facts developed on a case-by-case basis" (*Hughes*, *supra*, 194 Cal.App.3d at p. 998), the applicability of the doctrine as well as the collateral negligence exception to that doctrine must necessarily be based on the specific evidence in each case.

In *Hughes*, the defendant was a general contractor who hired the plaintiff's employer as the independent contractor for a six-floor building project. The plaintiff was a cement finisher injured by a fall after he stepped on a plywood panel that gave way. (*Hughes*, *supra*, 194 Cal.App.3d at pp. 992–993.) The evidence showed the plywood gave way because the independent contractor used pieces of plywood that were too small and not properly secured. (*Id.* at p. 999.) The court of appeal concluded the defendant was properly granted nonsuit on the applicability of the peculiar risk doctrine because "[n]egligent selection of pieces of plywood and its wedging support bears no relation to a peculiar risk inherent in the work for which liability could be imposed." (*Id.* at p. 1000.) "The doctrine does not apply to injuries resulting from the independent contractor's negligence for failing to take precautions as to the work's operative details which a careful contractor would take in its performance, such as the failure to use reasonable care to insure that the laminated plywood and wedges were properly installed which [the independent contractor] provided to its workers." (*Ibid.*)

The *Hughes* court found support for its holding in *Stark*. (*Hughes*, *supra*, 194 Cal.App.3d at pp. 1000–1001.) In *Stark*, the plaintiff carpenter was injured by a

power saw with a disabled guard while employed by a contractor building homes on the defendant's property. The contractor's employees regularly rendered the guards on their power saws inoperable like the one that injured the plaintiff. (*Stark*, *supra*, 94 Cal.App.3d at p. 968.) The *Stark* court concluded the peculiar risk doctrine does not apply to "the negligent use or misuse of hand tools by the independent contractor or its employees" as these are "ordinary and customary risks apart from the nature of the work itself." (*Id.* at p. 972.)

Unlike in *Hughes* and *Stark*, the evidence in this case did not demonstrate plaintiffs' injuries resulted from negligence with no relationship to the inherent risk of excavating soil with a bulldozer above an underground gas pipeline. As the trial court stated, striking the pipeline during the excavation work was the precise risk contemplated by BND and Ag-Wise. Kuykendall was aware striking a gas line could be dangerous and cause injuries, and safe measures needed to be taken to avoid damaging the line. He understood the aboveground paddle markers only approximated the line's location and PG&E must mark the line's exact location before soil ripping. Kuykendall further knew an excavator cannot continue ripping after the USA permit expires. Ag-Wise does not convincingly show Ojeda created a new risk not inherent in the work itself. In the absence of evidence Ojeda committed unusual or abnormal negligence causing the line strike and plaintiffs' resulting injuries, the trial court properly declined to instruct the jury on collateral negligence.

## II. Alleged Attorney Misconduct.

Ag-Wise argues a new trial should be granted because plaintiffs' attorneys engaged in pervasive and egregious misconduct. Ag-Wise contends plaintiffs' attorneys "relentlessly smeared Ag-Wise" during their cross-examination of Kuykendall and closing arguments.

### A. *Governing legal principles.*

A new trial may be ordered for an irregularity in the proceeding that prevented a

33.

party from receiving a fair trial. (§ 657, subd. (1).) "Attorney misconduct is an irregularity in the proceedings and a ground for a new trial." (*Garcia v. ConMed Corp.* (2012) 204 Cal.App.4th 144, 148 (*Garcia*); *City of Los Angeles v. Decker* (1977) 18 Cal.3d 860, 872 (*Decker*).) As a frequently quoted description of misconduct posits: "The law, like boxing, prohibits hitting below the belt. The basic rule forbids an attorney to pander to the prejudice, passion or sympathy of the jury." (*Martinez v. Department of Transportation* (2015) 238 Cal.App.4th 559, 566 (*Martinez*).)

"A party ordinarily cannot complain on appeal of attorney misconduct at trial unless the party timely objected to the misconduct and requested that the jury be admonished. [Citation.] The purpose of these requirements is to allow the trial court an opportunity to remedy the misconduct and avoid the necessity of a retrial; a timely objection may prevent further misconduct, and an admonition to the jury to disregard the offending matter may eliminate the potential prejudice. [Citations.] The failure to timely object and request an admonition waives a claim of error unless the misconduct was so prejudicial that it could not be cured by an admonition [citations], an objection or request for admonition would have been futile [citation] or the court promptly overruled an objection and the objecting party had no opportunity to request an admonition [citation]. Attorney misconduct is incurable only in extreme cases." (*Rayii v. Gatica* (2013) 218 Cal.App.4th 1402, 1411–1412 (*Rayii*).)

The failure to object and request an admonishment may be excused "where there are flagrant and repeated instances of misconduct" and the record is clear that objecting would have overemphasized the objectionable material and alienated the jury. (*Simmons v. Southern Pac. Transportation Co.* (1976) 62 Cal.App.3d 341, 355.) Under those circumstances, an appellate court may consider the alleged instances of misconduct despite the lack of objection and request for admonishment. (*Ibid*.) Also, an attorney may be excused from requesting an admonishment where the trial court has already

34.

refused multiple requests to admonish the jury. (*Love v. Wolf* (1964) 226 Cal.App.2d 378, 392.)

It is "not enough for a party to show attorney misconduct. In order to justify a new trial, the party must demonstrate that the misconduct was prejudicial." (*Garcia*, *supra*, 204 Cal.App.4th at p. 149; *Cassim*, *supra*, 33 Cal.4th at p. 800.) The reviewing court makes an independent determination as to whether the misconduct was prejudicial in light of the overall record. (*Decker*, *supra*, 18 Cal.3d at p. 872; *Martinez*, *supra*, 238 Cal.App.4th at p. 568.) In determining prejudice, the reviewing court considers: "(1) the nature and seriousness of the misconduct; (2) the general atmosphere, including the judge's control of the trial; (3) the likelihood of actual prejudice on the jury; and (4) the efficacy of objections or admonitions under all the circumstances." (*Martinez*, at p. 568.) Attorney misconduct justifies a new trial only if it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the misconduct. (*Cassim*, at p. 800.)

**B.** ***Questioning of Kuykendall.***

Ag-Wise contends plaintiffs' counsel asked Kuykendall questions that had little to do with the facts and were instead directed at painting Ag-Wise as a heartless corporate defendant who refused to accept blame.

About halfway through the trial, plaintiffs called Kuykendall as a witness. Plaintiffs' counsel confirmed Kuykendall's presence in court throughout the trial. The testimony continued:

> "Q. And I'm wondering if you heard the same things that I heard and they heard as we sat here, and specifically that, to this point in time, this very moment, not a single person has accepted any blame for what has happened.
>
> "[BND'S COUNSEL]: Your Honor, this is improper.
>
> "[PLAINTIFFS' COUNSEL]: I'm not done with the question. [¶] -- for what has happened to the Ruckman Family.

"[BND'S COUNSEL]: Objection, Your Honor. Argumentative and improper.

"THE COURT: Sustained.

"[PLAINTIFFS' COUNSEL]: Well, let me see if I can ask it this way: Sir, are you going to take the stand today, and are you going to blame -- or place any blame on Gloria Ruckman for what happened to her?

"A. I will not.

"Q. Will you place any blame on Amalia Ruckman for what happened to her?

"A. I will not.

"Q. Certainly, then, I can't imagine 17-day-old Robert Ruckman is going to get any of your blame, is he?

"A. He will not.

"Q. Then, who will?

"[AG-WISE'S COUNSEL]: Objection. Overbroad; vague.

"THE COURT: Sustained.

"[PLAINTIFFS' COUNSEL]: What about you, sir? Are you willing to accept any responsibility or blame for what got us here today?

"[AG-WISE'S COUNSEL]: Objection. Argumentative; improper.

"THE COURT: Sustained.

"[AG-WISE'S COUNSEL]: Your Honor, can I ask for an instruction at this point based on [counsel's] questions to the witness?

"THE COURT: Yeah. [¶] The jury will disregard those questions about whom he blames for this event. [¶] Let's stick to the facts, Counsel."

Plaintiffs' counsel then asked Kuykendall if he understood the trial was to ask the jury what, if any, blame should be placed. The trial court sustained Ag-Wise's objection to this question as argumentative.

"An argumentative question is a speech to the jury masquerading as a question.

36.

The questioner is not seeking to elicit relevant testimony. Often it is apparent that the questioner does not even expect an answer. The question may, indeed, be unanswerable. … An argumentative question that essentially talks past the witness, and makes an argument to the jury, is improper because it does not seek to elicit relevant, competent testimony, or often any testimony at all." (*People v. Chatman* (2006) 38 Cal.4th 344, 384.) Counsel's questions to Kuykendall about which party is to blame for plaintiffs' injuries were argumentative because they were not intended to elicit Kuykendall's knowledge of facts. This line of inquiry improperly sought Kuykendall's input on who was to blame for plaintiffs' injuries.[25] However, "[s]ome argumentative questions … are routine occurrences during the course of any trial." (*Ford v. City of Los Angeles* (2020) 47 Cal.App.5th 277, 288.) The trial court sustained several objections to plaintiffs' counsel's questions and, at defense counsel's request, admonished the jury to disregard questions about who Kuykendall blames for the event. We presume the jury followed the court's instruction in the absence of evidence to the contrary. (*Cassim*, *supra*, 33 Cal.4th at p. 803.)

Ag-Wise claims plaintiffs' counsel engaged in further misconduct from the "reptile" playbook during Kuykendall's examination by asking repeated questions about whether Ag-Wise was concerned with safety. The reptile theory improperly asks the jury to consider the safety of the community. (*Regalado v. Callaghan* (2016) 3 Cal.App.5th 582, 599.)[26] In this context, Ag-Wise calculates the trial court sustained more than 30

---

[25] The trier of fact determines if a party is liable for the plaintiff's injury, and, where liability is found against more than one tortfeasor, apportions liability amongst the responsible parties. (See *Hernandez v. Jensen* (2021) 61 Cal.App.5th 1056, 1064 [breach of duty and causation are questions of fact for the jury]; *Pfeifer v. John Crane, Inc.* (2013) 220 Cal.App.4th 1270, 1285 [the jury evaluates the relative responsibility of the various parties for an injury to equitably apportion liability among the parties].)

[26] Ag-Wise's opening brief quotes an unpublished portion of *Russell v. Department of Corrections & Rehabilitation* (2021) 72 Cal.App.5th 916 regarding the reptile theory. Citation to an unpublished opinion or any unpublished part of a published opinion is

objections, issued three curative instructions, and told counsel twice to "stick to the facts" during the first part of Kuykendall's testimony. Ag-Wise contends the objections and admonishments continued when counsel's questioning resumed and during redirect examination of Kuykendall.

We may only consider those instances of claimed misconduct during plaintiffs' counsel's examination of Kuykendall where Ag-Wise objected and requested an admonition to the jury or, alternatively, is excused from making such a request. (*Rayii*, *supra*, 218 Cal.App.4th at pp. 1411–1412.) During the parts of Kuykendall's testimony cited by Ag-Wise, we located five instances where counsel requested an admonition after an objection was sustained.

The first occurred while plaintiffs' counsel was asking Kuykendall about the services Ag-Wise would provide to Wildwood as part of their contract.

> "Q: … Sir, would you agree that deep ripping was a service that you were going to provide to John Bidart and Wildwood?
>
> "A. Well, we would hire Big N Deep on behalf of Wildwood.
>
> "Q: And is that a service that you were going to provide the landowner; 'yes' or 'no'?
>
> "A. That -- well, yeah, we would.
>
> "Q: What was that? What?
>
> "A. Yeah. Give me just a second, and let me kind of phrase this up. [¶] On behalf of Wildwood, we would go out and hire contractors to perform many projects.
>
> "Q: A service?
>
> "A. A service.
>
> "Q: A ripping service?

---

prohibited except in narrow circumstances not applicable here. (*People v. Williams* (2009) 176 Cal.App.4th 1521, 1529; Cal. Rules of Court, rule 8.1115(a), (b).)

"A. A ripping service.

"Q: Well, I'm confused, then, because just a little while ago, when I asked you this question with regard to the contract, you said, no, deep ripping wasn't a service. Would you like to change that answer, sir?

"[AG-WISE'S COUNSEL]: Your Honor, argumentative; misstates the testimony.

"THE COURT: Sustained.

"[AG-WISE'S COUNSEL]: I would ask for another instruction, yet again, based upon [counsel's] inappropriate questions.

"THE COURT: All right. At this point let's not phrase our questions in an argumentative fashion, Counsel."

Another admonition was requested while plaintiffs' counsel was asking Kuykendall if he called PG&E to ask if Alexander "was doing a good job." Kuykendall had not done so and agreed he could have made that call to PG&E. Plaintiffs' counsel questioned why Kuykendall did not call PG&E and whether he thought someone else would make that call. The trial court sustained four objections during this colloquy. Defense counsel requested another instruction. Plaintiffs' counsel responded that the questions were fair because Kuykendall may have delegated the authority. The court advised plaintiffs' counsel the questions lacked foundation and counsel promised to do a better job.

Defense counsel later requested another admonishment during plaintiffs' counsel's questions about Kuykendall's use of BND's services. Kuykendall trusted Alexander to perform the excavation work because he had seen Alexander working "all over the county." Plaintiffs' counsel questioned how Kuykendall was not able to see "all [BND's] line strikes" while watching Alexander do "all that ripping." The trial court sustained defense counsel's objection to the question as argumentative. Defense counsel requested another instruction, and the court advised the jury to disregard the questions for which there had been sustained objections. The court further told plaintiffs' counsel to "stick to

the facts."

In another instance, plaintiffs' counsel asked Kuykendall if "slip plowing" is ripping the entire field parallel to the gas line. Kuykendall explained that slip plowing is an implement, and all the ripping was slip plowed, it was just a matter of direction. Plaintiffs' counsel then said he would "change the word, since we're going to have the word game." Ag-Wise objected to this statement as argumentative and an inappropriate colloquy and requested the trial court give an instruction to counsel. The court told plaintiff's counsel not to make those comments in questions to the witness.

Lastly, Ag-Wise's counsel objected to a series of questions during plaintiffs' counsel's redirect examination of Kuykendall about measures Ag-Wise could have taken to prevent the line strike. Ag-Wise's counsel asked the trial court to admonish plaintiffs' counsel, and the court advised counsel to confine his questions to the scope of cross-examination.

These instances show that when defense counsel requested an admonishment for alleged misconduct, the trial court gave one. Ag-Wise's failures to request the jury be admonished therefore cannot be excused on the ground that the court had refused earlier requests. (*Love v. Wolf*, *supra*, 226 Cal.App.2d at p. 392.)

Moreover, none of these instances, whether considered individually or collectively, can be characterized as misconduct. This was a monthlong trial with multiple witnesses. As noted above, some argumentative questions are to be expected during trial. Despite some objectionable phrasing, questions directed at whether Ag-Wise negligently exercised control over BND's work were fair game given the disputed issues at trial. Furthermore, in two of the above instances the trial court admonished counsel on grounds not indicative of misconduct. In one, the court admonished counsel the questions lacked foundation while in another the court advised counsel the questions were outside the scope. Asking questions lacking foundation or outside the scope of cross-examination does not generally constitute misconduct because these are not the

40.

types of questions designed to inflame the jury. (See Fairbank, et al., Cal. Practice Guide: Civil Trials and Evidence (The Rutter Group 2024) ¶¶ 10:64, 10:65, 10:66, 10:70, 10:81, 10:83 (Civil Trials and Evidence) [improper to ask questions that are argumentative, assume facts not in evidence, misstate the evidence, harassing or prejudicial].) The court instructed the jury at the beginning of trial and prior to closing arguments that the attorneys' questions are not evidence and to ignore questions where an objection was sustained. (CACI No. 106, No. 5002.) Again, we assume the jury followed the court's instructions in the absence of evidence to the contrary. Ag-Wise has not shown a reasonable probability of a more favorable result for Ag-Wise absent plaintiffs' counsel's questioning of Kuykendall.

## C. *Closing argument.*

Ag-Wise contends plaintiffs' counsel's examination of Kuykendall was "just the appetizer," and the main course of misconduct occurred during closing argument. Ag-Wise's misconduct claims during plaintiffs' counsel's closing argument can be categorized as: (1) improper personal attacks on Ag-Wise and comparisons between the parties; (2) invoking the "golden rule;" (3) anchoring[27]; (4) comparing damages to a Picasso painting; and (5) calling attention to insurance.[28] Ag-Wise raised most of these same issues in its motion for a new trial, which the trial court denied.[29]

Plaintiffs respond that Ag-Wise's claims of misconduct during counsel's closing argument have been largely forfeited by failure to object or request an admonition

---

[27] Anchoring is where counsel suggests a high damage figure to the jury as a starting point. (*Fernandez v. Jimenez* (2019) 40 Cal.App.5th 482, 492, fn. 5 (*Fernandez*).)

[28] Though Ag-Wise refers generally to "plaintiffs' counsel," some claims of misconduct involve the attorney representing Gloria and Amalia while others involve the attorney representing Robert, Gildardo, and Young Robert.

[29] The trial court's order denying Ag-Wise's motion for a new trial is not directly appealable but may be reviewed on appeal from the judgment. (*Dominguez v. Pantalone* (1989) 212 Cal.App.3d 201, 215.)

accompany a sustained objection. Plaintiffs assert counsel is permitted to argue the evidence and attack the opposing party's credibility during closing arguments. Plaintiffs further contend that even assuming there was attorney misconduct, Ag-Wise failed to show the verdict would have been different absent the misconduct. Plaintiffs have the better argument.

In closing argument, plaintiffs' counsel discussed whether any defendant had accepted responsibility. Plaintiffs' counsel asked the jury, "how many times have you heard anybody sit on that stand and accept any responsibility, any blame? How could that be? How is that right?" During rebuttal, counsel stated: "What's true redemption? In order to have true redemption, you need three things …. You've got to admit that you were wrong. Second thing, sincerely say you're sorry. Not just say, 'I'm sorry.' Sincerely mean it. And then the third thing is: What can you do to make up for it?"

During parts of closing argument, plaintiffs' counsel made references to Ag-Wise as a "corporate client" and more than once referred to Ag-Wise's counsel as a "corporate lawyer." Plaintiffs' counsel stated, "you can't be a corporate lawyer, after decades and decades of being a corporate lawyer, unless you approach the problem from a position of emotionless objectivity and a complete lack of caring for what is real and what is the most valuable. They pay you to lose that because you have to constantly try to convince people that it has no value so that you can earn your money for helping other corporations hold on to as much of it as they can."

"Counsel is granted wide latitude to discuss the merits of the case, both as to the law and facts, and is entitled to argue his or her case vigorously and to argue all reasonable inferences from the evidence." (*Nishihama v. City and County of San Francisco* (2001) 93 Cal.App.4th 298, 305 (*Nishihama*); *Cassim*, *supra*, 33 Cal.4th at p. 795 [counsel is not limited to Chesterfieldian politeness in making closing arguments].) "An attorney who exceeds this wide latitude commits misconduct." (*Cassim*, at p. 796.) "Personal attacks on opposing parties and their attorneys, whether

42.

outright or by insinuation, constitute misconduct." (*Las Palmas Associates v. Las Palmas Center Associates* (1991) 235 Cal.App.3d 1220, 1246; *Cassim*, at p. 796 [improper to impugn counsel's motives or character].)

Ag-Wise did not object to the above parts of plaintiffs' counsel's closing argument. As previously discussed, "a claim of misconduct is entitled to no consideration on appeal unless the record shows a timely and proper objection and a request that the jury be admonished." (*Horn v. Atchison, Topeka and Santa Fe Railway Co.* (1964) 61 Cal.2d 602, 610.) Appellate review of the above instances of claimed misconduct is precluded by Ag-Wise's failure to object and request an admonishment. Though Ag-Wise made an oral motion for a mistrial outside the jury's presence after the first part of plaintiffs' counsel's closing argument, which the trial court denied, a later motion for mistrial does not "forestall the accumulation of prejudice by repeat[ed] improprieties" that a timely objection and request for admonishment could prevent. (*Ibid*.) Ag-Wise's failure to object to counsel's allegedly "blatant misconduct" forfeits the issue on appeal.

Even if these claims were not forfeited, we are unconvinced by Ag-Wise's assertions that counsel's statements and witness questions about blame motivated the jury to assign less fault to PG&E and more fault to BND and Ag-Wise. The jury allocated 10 percent of responsibility to Ag-Wise with 40 percent to PG&E and 50 percent to BND. This allocation of liability is fairly supported by the evidence of the parties' respective roles in causing plaintiffs' injuries.[30] Notably, Ag-Wise did not challenge the jury's findings on liability as unsupported by substantial evidence. (See *Pfeifer v. John Crane, Inc.*, *supra*, 220 Cal.App.4th at pp. 1285–1286 [a jury's findings on allocation of liability subject to challenge for lack of substantial evidence].) The trial court instructed the jury

---

[30] Outside the jury's presence and before the verdict was rendered, the trial court hypothetically and presciently posited the same allocation of liability amongst the defendants while discussing the verdict form with the attorneys.

its verdict must be based solely on the evidence and not to be influenced by bias in favor or against any party. (CACI No. 113.) Nothing indicates the jury's verdict was influenced by improper motivations.

Ag-Wise identifies two instances of purported misconduct during plaintiffs' counsel's closing argument for anchoring and comparing damages to a Picasso painting. These statements, along with other purported acts of misconduct, went unchallenged by Ag-Wise and must be deemed forfeited.

Ag-Wise did object to plaintiffs' counsel's statement that "justice" in a civil case differs from a criminal case because a corporation cannot be put "behind bars." The trial court overruled Ag-Wise's objection that counsel was making a criminal implication. Counsel's comments were fair commentary in explaining to the jury how a civil trial differs from a criminal trial, which counsel surmised the jury may be more familiar with based on a popular television show. To the extent plaintiffs' counsel implied the jury could punish Ag-Wise by awarding money as Ag-Wise claims, the jury instructions expressly told the jury not to punish Ag-Wise or BND in awarding damages. (CACI No. 3924.)

Ag-Wise alleges plaintiffs' counsel improperly invoked the golden rule during trial. So-called golden rule arguments, where counsel asks the jurors to put themselves in the plaintiff's shoes, are improper. (*Cassim*, *supra*, 33 Cal.4th at p. 797.) In the context of damages, a " 'golden rule' argument indicates to the jury that it would be proper in calculating damages to place themselves in the plaintiff's shoes and award the amount they would 'charge' to undergo equivalent disability, pain and suffering." (*Nishihama*, *supra*, 93 Cal.App.4th at p. 305.) This is improper because the "only person whose pain and suffering is relevant in calculating a general damage award is the plaintiff." (*Loth v. Truck-A-Way Corp.* (1998) 60 Cal.App.4th 757, 764–765.)

Of the instances cited by Ag-Wise where plaintiffs' counsel purportedly invoked

the golden rule during closing argument, we consider the sole instance[31] where Ag-Wise objected:

> "[PLAINTIFFS' COUNSEL]: … Now, the Defendants want to make it sound crass, 'Oh, how dare you ask for money.' If the shoe were on the other foot and any one of us damage one of their piece of equipment, you think they'd wait for a New York minute to send us a bill, an invoice, and they throw in the labor --
>
> "[AG-WISE'S COUNSEL]: Objection, Your Honor. Golden Rule.
>
> "THE COURT: Sustained.
>
> "[PLAINTIFFS' COUNSEL]: Okay. So -- and, by the way, I was saying 'you' in the third person. I just want the record to be clear about that."

We find no misconduct. Ag-Wise objected in the middle of the argument, the objection was sustained, and plaintiffs' counsel clarified he did not intend to refer directly to the jury. Any error was quickly remedied.

Lastly, Ag-Wise contends plaintiffs' counsel improperly called attention to insurance during closing argument. "Evidence that a person was insured against liability for another person's injury is inadmissible to prove negligence or other wrongdoing. (Evid. Code, § 1155.) Such evidence is irrelevant to both the question of liability and the amount of damages. [Citation.] Evidence or statements by counsel suggesting that the defendant was insured against liability could cause the jury to find liability more readily or to inflate its award of damages in some circumstances. Although the insured's liability is not at issue if the evidence or statements by counsel relate to the plaintiff's insurance rather than the defendant's, evidence or statements suggesting that the plaintiff was insured could cause the jury to believe that the plaintiff will be compensated by

---

[31] Another claimed instance of invoking the golden rule occurred during plaintiffs' counsel's questioning of Dr. Lakes. Plaintiffs' counsel asked Dr. Lakes if she would want her own kids to have the kind of test scores Young Robert produced. Ag-Wise objected, and the trial court overruled the objection. This was not improper because counsel asked Dr. Lakes, not the jurors, to put herself in plaintiff's shoes.

45.

insurance, which could cause the jury to find no liability more readily or to award lower damages." (*Bell v. Bayerische Motoren Werke Aktiengesellschaft* (2010) 181 Cal.App.4th 1108, 1122.)

Plaintiffs' counsel wondered to the jury why no witnesses had been asked how much insurance they had. Ag-Wise objected, and the trial court overruled the objection. Plaintiffs' counsel then explained "the reason you didn't hear any of those questions is because the law says you shouldn't consider it. Why not? Because the law wants you to be a neutral arbitrator, wants you to call a ball a ball, a strike a strike. You shouldn't be saying, 'Well, they don't have any insurance; so we're going to give them a break.' [¶] The law says, 'No, no, no, no. No, that's not right. It's on merit.' [¶] Or 'They have plenty of insurance; so let's hit them.' [¶] Law says, 'You can't do that.' That's why you don't hear it. Okay? Does that make sense? It's based on merit."

We conclude plaintiffs' counsel's brief reference to insurance was not improper. Counsel's comments are fairly construed as emphasizing to the jury not to consider whether either side has insurance in determining liability or damages. He accurately described the law that insurance is irrelevant to those determinations. Counsel did not violate the trial court's in limine order precluding references to Ag-Wise's insurance because he did not disclose that Ag-Wise has insurance.[32] The jury was also instructed not to consider whether any party has insurance and to decide the case based only on the law and the evidence. (CACI No. 105.)

Based on our examination of the record, we do not find plaintiffs' counsel's statements during closing argument, whether considered individually or collectively, constituted misconduct. This was a lengthy trial with multiple witnesses and zealous representation by all parties' attorneys. The trial court maintained firm and fair control

---

[32]   Before trial, the trial court granted Ag-Wise's motion in limine precluding plaintiffs from referring to insurance.

over the proceedings including admonishing the attorneys or the jury when warranted. We disagree with Ag-Wise that plaintiffs' counsel's misconduct was so egregious and pervasive that a new trial is required even without objections to or prejudice from each instance of misconduct. Even considering the alleged misconduct during counsel's questioning of Kuykendall together with counsel's closing argument, this is not a case where counsel engaged in repeated, pervasive, and flagrant misconduct. (Cf. *Martinez*, *supra*, 238 Cal.App.4th at pp. 564–565 [attorney repeatedly violated in limine rulings, gave several improper statements during opening statement and closing argument, and made gratuitous Nazi references].)

"[W]e also consider the ameliorating effect of the trial court's instructions to the jury to guide its decisionmaking." (*Cassim*, *supra*, 33 Cal.4th at p. 803.) The trial court repeatedly instructed the jury to decide the facts based on the law and the evidence. The jury was further instructed what the attorneys say during trial is not evidence. As discussed above, several instances of purported misconduct were countered by a jury instruction.

The trial court also denied Ag-Wise's motion for a new trial, which was based in part on the same allegations of misconduct raised on appeal. The trial court is in a better position to determine if a verdict resulted from alleged misconduct. (*Hilliard v. A.H. Robins Co.* (1983) 148 Cal.App.3d 374, 407.) Because the trial court has the "unique ability to determine whether a verdict resulted in whole or in part from the alleged misconduct, its decision to deny a motion for new trial should not be disturbed unless plainly wrong." (*Nishihama*, *supra*, 93 Cal.App.4th at p. 305.) The court assumed without deciding plaintiffs' counsel engaged in misconduct, but concluded Ag-Wise had not shown the jury could not have reasonably reached the verdicts that it did, or that the jury failed to reasonably interpret the evidence or in some way did not understand or properly apply the law. That determination is not plainly wrong. Ag-Wise failed to show prejudicial misconduct warranting reversal and a new trial.

### III.     Challenge to Awards as Excessive.

Ag-Wise challenges the jury's award of noneconomic damages to Gloria, Amalia, and Young Robert—totaling $73 million—as excessive.  Ag-Wise argues that while Gloria and Amalia were seriously injured, they have recovered and compensating them like other plaintiffs who have not recovered is irrational.  Ag-Wise further contends the total award of $25 million to Young Robert is excessive.  Ag-Wise made these arguments in its motion for a new trial, which the trial court denied as previously discussed.

#### A.     *Governing legal principles*.

A jury may, in its subjective discretion, award a plaintiff reasonable noneconomic damages he or she has suffered and will suffer in the future as the result of an injury. (*Damele v. Mack Trucks, Inc.* (1990) 219 Cal.App.3d 29, 38; *Garfoot v. Avila* (1989) 213 Cal.App.3d 1205, 1210.)  Noneconomic damages compensate a plaintiff for nonpecuniary injuries including pain and suffering, invasion of a person's bodily integrity (i.e., the fact of the injury itself), disfigurement, disability, impaired enjoyment of life, and susceptibility to future harm or injury.  (*Bigler-Engler v. Breg, Inc.* (2017) 7 Cal.App.5th 276, 300 (*Bigler-Engler*); Civ. Code, § 1431.2, subd. (b)(2) [" 'non-economic damages' means subjective, non-monetary losses including, but not limited to, pain, suffering, inconvenience, mental suffering, emotional distress, loss of society and companionship, loss of consortium, injury to reputation and humiliation"].)

"The amount of [noneconomic] damages is a fact question, first committed to the discretion of the jury and next to the discretion of the trial judge on a motion for new trial." (*Seffert v. Los Angeles Transit Lines* (1961) 56 Cal.2d 498, 506 (*Seffert*); § 657, subd. (5) [a new trial may be granted if the trial court finds the damages are excessive].) "Determining the amount of money a plaintiff is to be awarded as compensation for noneconomic injuries is '[o]ne of the most difficult tasks imposed on a fact finder.' " (*Burchell v. Faculty Physicians & Surgeons etc.* (2020) 54 Cal.App.5th 515, 527 (*Burchell*).)  " 'No method is available to the jury by which it can objectively evaluate

such damages, and no witness may express his subjective opinion on the matter. [Citation.] In a very real sense, the jury is asked to evaluate in terms of money a detriment for which monetary compensation cannot be ascertained with any demonstrable accuracy.' " (*Loth v. Truck-A-Way Corp.*, *supra*, 60 Cal.App.4th at p. 764.) Given the inherent subjectivity in making this determination, "[t]he amount to be awarded is 'a matter on which there legitimately may be a wide difference of opinion.' " (*Seffert*, at p. 508.)

"Appellate review of the jury's determination of noneconomic damages is ' "very narrow." ' " (*Phipps v. Copeland Corporation LLC* (2021) 64 Cal.App.5th 319, 343 (*Phipps*).) "Our role is different from that of the jury and the trial court. 'The duty of an appellate court is to uphold the jury and trial judge whenever possible.' " (*Burchell*, *supra*, 54 Cal.App.5th at p. 527.) "An appellate court can interfere on the ground that the judgment is excessive only on the ground that the verdict is so large that, at first blush, it shocks the conscience and suggests passion, prejudice or corruption on the part of the jury." (*Seffert*, *supra*, 56 Cal.2d at p. 507.) " 'In making this assessment, the court may consider, in addition to the amount of the award, indications in the record that the fact finder was influenced by improper considerations.' [Citation.] The relevant considerations include inflammatory evidence, misleading jury instructions, improper argument by counsel, or other misconduct." (*Bigler-Engler*, *supra*, 7 Cal.App.5th at p. 299.)

"We review the jury's damages award for substantial evidence, giving due deference to the jury's verdict and the trial court's denial of the new trial motion." (*Bigler-Engler*, *supra*, 7 Cal.App.5th at p. 300.) We " 'consider the whole record, view the evidence in the light most favorable to the judgment, presume every fact the trier of fact could reasonably deduce from the evidence, and defer to the trier of fact's determination of the weight and credibility of the evidence.' " (*Phipps*, *supra*, 64 Cal.App.5th at p. 343.)

**B.** *Awards to Gloria and Amalia.*

The jury awarded Gloria $17 million in past noneconomic damages and $13 million in future noneconomic damages. Gloria's life expectancy was given as 49.5 years. For Amalia, the jury awarded $10 million in past noneconomic damages and $8 million in future noneconomic damages. Amalia's life expectancy was given as 28.9 years. The jury was instructed that, for both past and future damages, Gloria claimed physical pain, disfigurement, impaired bodily temperature regulation, impaired range of motion in hands and wrists, humiliation, embarrassment, fear, deprivation of bonding with baby, hypervigilance, impaired intimacy, impaired sleeping, and traumatic brain injury. Past and future noneconomic damages for Amalia included all the same claims except deprivation of bonding with baby.

Ag-Wise concedes Gloria and Amalia were badly burned and suffered terrible injuries but contend their combined award of $48 million is not justified by the evidence. Ag-Wise primarily focuses on the extent to which Gloria and Amalia have recovered. This focus overlooks the significant injuries plaintiffs sustained, the extensive and sometimes excruciating medical treatment they underwent, not to mention their experience of being burned alive in a literal inferno. They suffered severe burn injuries over a significant portion of their bodies with Gloria's burns covering 25 percent of her total body surface area. Both had second and third degree burns, with Gloria also sustaining fourth degree burns. The hydrotherapy Amalia and Gloria underwent in the hospital was reportedly so agonizing that pain medications proved futile. Both sustained a traumatic brain injury. As plaintiffs' counsel recognized when discussing damages during closing argument, the past "was a little bit more intense than the future." The jury apparently agreed given the future damages award was less than the past damages award for Gloria and Amalia. The greater amount to Gloria logically reflects her more significant burns, her distress at discontinuing breastfeeding, and the traumatic effect of her separation from Young Robert. The past damages cover a substantial amount of time

50.

because approximately six and a half years passed between the explosion and the trial. Substantial evidence supports the award for past damages to Gloria and Amalia and does not shock the conscience given what plaintiffs endured.

Ag-Wise particularly contests the award for future damages. Ag-Wise acknowledges Gloria and Amalia still suffer from the effects of their injuries but contends both live normal, productive lives and are not dependent on pain medications or assistance from others. To be sure, Gloria and Amalia have demonstrated admirable resilience. The Ruckmans built a new house designed by Gloria who also managed the house's construction. She and Robert had another son in 2018 and a daughter in 2020. In June 2016, Amalia returned to her job as a senior family advocate for a school district and continues to work.

Despite Gloria and Amalia's resolve, uncontradicted evidence demonstrates their lives have been permanently altered by their injuries. Both women still have long life expectancies meaning their future damages cover many years. (Cf. *Johnson v. Monsanto Co.* (2020) 52 Cal.App.5th 434, 451–454 [future damages award of $33 million reduced to $4 million because the award was unsupported by the evidence where the plaintiff was only expected to live two years].) And the evidence demonstrates Gloria and Amalia will continue to suffer physically and emotionally for the remainder of their lives. Both still have physical pain and are permanently disfigured by their scars. The jury was shown some of those scars. Gloria has webbing on her hands where the skin was stretched over and healed that restricts her hand activities. The scar tissue is "very tight" and contracts when the sun is too intense. Heat from the sun bothers Gloria, goes through whatever she is wearing, and makes her feel like she is "burning all over again." Her ability to exercise is limited due to the burns on the back of her tendons, though she manages to do yoga, walk on a treadmill, and garden. Amalia has pain every day, all day long.

From a psychological perspective, Gloria and Amalia have chronic PTSD. Gloria continues to treat with a psychologist. She remains hypervigilant to noises from

construction or fireworks and must know the noise's source to calm her anxiety. Gloria is aware of exits everywhere she goes. While Ag-Wise asserts Gloria has recovered well in part because she managed construction of the Ruckmans' new house,[33] the way Gloria designed the house reveals her persistent hypervigilance. The house has many doors because Gloria wants exit routes "in case something happened." The house also has sprinklers, extra fire extinguishers, and a detached garage. She designed the house without gas because she does not want gas near her again. For Amalia's part, though she has not seen a psychologist since 2020, she likewise still suffers from emotional aftereffects. Any noise startles her and can act as a trigger. Noise like fireworks take Amalia back to the explosion and make her want to take shelter. Ground movement is another trigger because of how the explosion rocked the ground in the house. She is paranoid about clothing and wears long sleeves and covers her legs to protect her skin from the sun. Her scars make her feel ugly.

Ag-Wise's argument the damages award is unjustified because Gloria and Amalia have recovered well is little more than an invitation to reweigh the evidence. Doing so is inconsistent with our role on review. The jury and the trial court saw Gloria and Amalia, as well as the other witnesses who testified about damages, and were able to see the resulting impairment from their injuries. It was for the jury to weigh the evidence and determine the amount of future damages. As the trial court noted in denying Ag-Wise's motion for a new trial, plaintiffs had several doctors testify at trial about damages, but Ag-Wise did not present a doctor to respond to those opinions. The trial court, "sitting as a 13th juror," determined the award was not excessive based on its review of the evidence. (*Buell-Wilson v. Ford Motor Co.* (2006) 141 Cal.App.4th 525, 557, disapproved on another ground in *Kim v. Toyota Motor Corp.* (2018) 6 Cal.5th 21, 38, fn.

---

[33] Though Ag-Wise asserts Gloria "works as a construction manager without limitation," the record is unclear if Gloria has worked in that capacity since the explosion other than managing construction of her own home.

6.)  The jury and trial court's determinations are entitled to "great weight," and we cannot say the award of future damages is unreasonable viewing the entire record in the light most favorable to the judgment.  (*Seffert*, *supra*, 56 Cal.2d at p. 506.)

*Mondine v. Sarlin* (1938) 11 Cal.2d 593, which Ag-Wise relies upon, is distinguishable.  In that case, the plaintiff suffered severe burns on his right side because of the defendant's negligence.  In halving the plaintiff's award, our Supreme Court found "that practically the only permanent injury which [the plaintiff] has sustained is the disfigurement of the right side of his body and the partial impairment of the use of his right hand.  There is no medical testimony that the burns he received had any permanent deleterious effect upon his health or will produce serious consequences in the future." (*Id.* at p. 600.)  Based on the circumstances, the court found the jury's award of $20,000 raised a presumption the amount was not based upon a fair consideration of the facts relating to the injuries the plaintiff suffered.  (*Ibid.*)  Here, in contrast and as discussed above, medical testimony showed Gloria and Amalia suffered physical and emotional injuries that will permanently affect them.

Ag-Wise contends the award to Gloria and Amalia is excessive compared to median total verdicts for burn injuries according to Thomson Reuters' Personal Injury Valuation Handbook (the Handbook).  According to Ag-Wise, the Handbook, which Ag-Wise also cited in its motion for a new trial, shows the nationwide median total verdict for the most extreme burn injuries is $3.1 million and the mean award is $5.8 million. The defendant in *Burchell* similarly cited a Thomson Reuters' Personal Injury Valuation Handbook to argue the plaintiff's damages award was a statistical outlier.  (*Burchell*, *supra*, 54 Cal.App.5th at p. 528.)  The *Burchell* court observed that "while it is appropriate to look at awards in similar cases, or to contrast this case on its facts with cases involving awards of a similar magnitude, 'ultimately we must determine the propriety of the award based upon the facts of this case.'  [Citation.]  Evidence of other verdicts is 'relevant as a point of reference,' but 'a verdict may not be held to be

53.

excessive as a matter of law simply because it exceeds the amount awarded in other cases.' " (*Ibid*.)  The court found unpersuasive the statistical analysis and anecdotal evidence of other cases proffered by the defendant, concluding that "[g]iven the differences in factual circumstances, and the substantial discretion afforded to the jury, statistical comparisons do not provide much of a compass." (*Id.* at p. 529.)

We find the reasoning of *Burchell* persuasive.  Comparing verdicts has long been considered of limited value.  "Such examination demonstrates that such awards vary greatly.  [Citation.]  Injuries are seldom identical and the amount of pain and suffering involved in similar physical injuries varies widely." (*Seffert*, *supra*, 56 Cal.2d at p. 508.) The trial court here properly declined to use or consider the Handbook in deciding Ag-Wise's motion for a new trial.  (See e.g., *Phipps*, *supra*, 64 Cal.App.5th at pp. 338–340 [the trial court could not consider a survey of similar verdicts prepared by counsel in determining a motion for new trial for excessive damages pursuant to §§ 657, 658].)  As the court aptly stated, "[t]he Handbook is based on awards already made and provides *no* information or specifics as to those Plaintiffs' specific injuries or the specific circumstances under which the injuries were received."

For similar reasons, we find unpersuasive the few published cases cited by Ag-Wise to argue the award is unreasonable when compared to "cases involving catastrophic injuries leading to death or life-limiting care plans."  As explained in *Rufo v. Simpson* (2001) 86 Cal.App.4th 573, 616:  "This method of attacking a verdict was disapproved by our Supreme Court in *Bertero v. National General Corp.* [1974] 13 Cal.3d 43, 65, [footnote] 12 [citation], where it said, 'Defendants have compiled a lengthy list of judgments awarding damages which have been reversed on appeal as excessive.  Those cases do not, in and of themselves, mandate a reversal here.  The vast variety of and disparity between awards in other cases demonstrate that injuries can seldom be measured on the same scale.  The measure of damages suffered is a factual question and as such is a subject particularly within the province of the trier of fact.  For a reviewing

court to upset a jury's factual determination on the basis of what other juries awarded to other plaintiffs for other injuries in other cases based upon different evidence would constitute a serious invasion into the realm of factfinding.' "  Two of the cases cited by Ag-Wise are of limited assistance given the award's size was not challenged on appeal. (*Landeros v. Torres* (2012) 206 Cal.App.4th 398; *Karlsson v. Ford Motor Co.* (2006) 140 Cal.App.4th 1202.)  As in *Burchell*, the amount of Gloria and Amalia's damages was reached by the jury, concurred with by the trial court, and is "within the bounds of reason given the evidence presented at trial."  (*Burchell*, *supra*, 54 Cal.App.5th at p. 529.)

Ag-Wise reiterates its claim that plaintiffs' counsel improperly appealed to the jury's sympathy, anger, and bias against corporate defendants, and the amount of the award shows counsel was successful in doing so.  While we acknowledge the award is large, "[t]he fact that the verdict is very large does not alone compel the conclusion the award was attributable to passion or prejudice."  (*Fernandez*, *supra*, 40 Cal.App.5th at p. 490.)  We have already concluded there was no prejudicial misconduct.  Nothing in the record indicates the jury did anything other than consider the evidence in determining the amount of damages due to Gloria and Amalia.  Based on the uncontradicted evidence of the deleterious effects of plaintiffs' injuries on their lives, we conclude the awards were not excessive.

### C.    *Award to Young Robert.*

The jury awarded Young Robert noneconomic damages in the amount of $4 million for past loss and $21 million for future loss.  Young Robert has a life expectancy of 70.9 years.  For past damages, Young Robert claimed:  traumatic brain injury, deprivation of bonding with mom, emotional distress, inconvenience, fear, and sound sensitivity.  Future damages included the same claims except deprivation of bonding with mom.

Ag-Wise argues the award to Young Robert is unjustified because he suffered a mild to moderate brain injury that primarily affects his ability to socialize but he did not

suffer a significant acute brain injury from the explosion and requires no assistance for ongoing care.

Ag-Wise's arguments contesting Young Robert's award fare no better than its challenge to Gloria and Amalia's awards. At only 17 days old when the explosion occurred, Young Robert was the most vulnerable of the plaintiffs. Though Young Robert did not suffer any burns because Gloria protected him with the fire-retardant jacket, Young Robert showed development delays, particularly in language, from a young age. He was slow to speak compared with other children his age. He would speak loudly and showed hypersensitivity to noises from a few months old. Young Robert was diagnosed with a traumatic brain injury and neurocognitive disorder. He has deficits in language, fine motor skills, and auditory attention. Dr. Lakes testified it had been a stressful six years between the explosion and trial for Young Robert given his bonding and breastfeeding with his mother was interrupted and his development delay and deficit.

Ag-Wise highlights the positive aspects of Young Robert's intellectual abilities while diminishing the challenges he will face for the rest of his life. We reiterate that reweighing the evidence is inconsistent with our role on review. Granted, Young Robert is not an invalid and does not require ongoing care. But his deficits are expected to be lifelong. While bright, he will be at a constant disadvantage from his peers. He does fine academically but is deficient socially. Young Robert continues to treat with an occupational therapist. Though Dr. Lakes anticipates Young Robert will be able to find academic and professional success, he will need extra support, practice, and repetition to overcome his deficits. The future damages award covers a significant amount of time given Young Robert's 70-year life expectancy. Per the discussion above, we find unpersuasive Ag-Wise's comparison of Young Robert's award to other awards for brain injuries reflected in the Handbook. We conclude Young Robert's award was not excessive.

## IV.     Validity of Section 998 Offer.

Finally, Ag-Wise contends the interest and costs awarded under section 998 and Civil Code section 3291 should be reversed because plaintiffs' section 998 offer was invalid.

### A.     *Additional background.*

In May 2018, plaintiffs served Ag-Wise an offer to compromise pursuant to section 998 to resolve their claims for a total of $5,999,975.  Plaintiffs made separate section 998 offers to Wildwood.

On June 5, 2018, California Capital Insurance Group, Ag-Wise's insurance carrier, sent a letter to plaintiffs that the offer could neither be accepted nor rejected as there remained questions of liability, causation, and damages, and discovery was ongoing.  The insurer's letter further stated, "we cannot partially exhaust coverage to the detriment of our insureds."  By statute, plaintiffs' offer was withdrawn 30 days from when it was made.  (§ 998, subd. (b)(2).)

After trial, plaintiffs requested costs including expert witness fees of $317,813.06 and prejudgment interest under section 998 of $19,047,931.51.  Ag-Wise moved to tax (or strike) those costs.  Ag-Wise argued plaintiffs' section 998 offer was invalid, not made in good faith, and had no reasonable prospect of acceptance, and plaintiffs' costs are unreasonable and improperly calculated.  Plaintiffs filed an opposition to Ag-Wise's motion.

On January 11, 2023, the trial court held a hearing regarding Ag-Wise's motion to tax costs.  The court noted the total judgment to Ag-Wise was $24,190,000, not $44,190,000 as asserted by plaintiffs because Ag-Wise was entitled to a $20 million offset for Wildwood's settlement.  The court observed the parties do not dispute plaintiffs received a more favorable judgment than their section 998 offer.  The court stated in relevant part:  "The real issue is whether there is a reasonable prospect of acceptance. Ag-Wise states that since to offer -- accept the offers would leave Wildwood without

insurance coverage, and that Plaintiffs knew this, however, that does not make these offers in bad faith.  Ag-Wise had a period of time to accept or reject the offers.  It could have explored the possibility of whether Wildwood was going to seek coverage under the policy or not or perhaps make counteroffers, neither of which it appears Ag-Wise did.  And in the courts, while the offers may have put Ag-Wise between a rock and a hard place, that did not make the offers unreasonable or in bad faith.  And while insurance is not something that's completely irrelevant to the Court's consideration of reasonableness, it is among the factors the Court could consider in exercising its discretion."  The court gave its tentative decision that Ag-Wise's motion would be denied on the grounds that the section 998 offers were made in bad faith.  The court however granted Ag-Wise's motion to strike the amount of prejudgment interest per section 998 in plaintiffs' cost bill and instead awarded plaintiffs 10 percent interest pursuant to Civil Code section 3291 to be applied to the $24,190,000 judgment against Ag-Wise.  The court otherwise denied the motion to strike costs.  The court's order memorializing its decision issued on January 26, 2023.

### B.       *Governing legal principles.*

"Section 998 allows for any party in a civil suit to serve a settlement offer to any other party before the commencement of trial."  (*Adams v. Ford Motor Co.* (2011) 199 Cal.App.4th 1475, 1482, fn. omitted.)  Section 998, subdivision (d) provides that "[i]f an offer made by a plaintiff is not accepted and the defendant fails to obtain a more favorable judgment or award in any action or proceeding other than an eminent domain action, the court or arbitrator, in its discretion, may require the defendant to pay a reasonable sum to cover postoffer costs of the services of expert witnesses, who are not regular employees of any party, actually incurred and reasonably necessary in either, or both, preparation for trial or arbitration, or during trial or arbitration, of the case by the plaintiff, in addition to plaintiff's costs."  Civil Code section 3291 provides in relevant part:  "If the plaintiff makes an offer pursuant to [section 998] which the defendant does

not accept prior to trial or within 30 days, whichever occurs first, and the plaintiff obtains a more favorable judgment, the judgment shall bear interest at the legal rate of 10 percent per annum calculated from the date of the plaintiff's first offer pursuant to [section 998] which is exceeded by the judgment, and interest shall accrue until the satisfaction of judgment."

The purpose of section 998 is to encourage the settlement of litigation without trial. (*Westamerica Bank v. MBG Industries, Inc.* (2007) 158 Cal.App.4th 109, 129.) Section 998 encourages settlement "by providing a strong financial disincentive to a party—whether it be a plaintiff or a defendant—who fails to achieve a better result than that party could have achieved by accepting his or her opponent's settlement offer. (This is the stick. The carrot is that by awarding costs to the putative settler the statute provides a financial incentive to make reasonable settlement offers.)" (*Bank of San Pedro v. Superior Court* (1992) 3 Cal.4th 797, 804, superseded on other grounds by statute as stated in *Quiles v. Parent* (2017) 10 Cal.App.5th 130, 144.)

"A section 998 offer must be made in good faith and be ' "realistically reasonable under the circumstances of the particular case," ' and carry with it some reasonable prospect of acceptance. [Citations.] The reasonableness of the offer depends upon the information available to the parties as of the date the offer was served." (*Westamerica Bank v. MBG Industries, Inc.*, *supra*, 158 Cal.App.4th at pp. 129–130.) "Once the offeror shows the section 998 offer is valid, the burden shifts to the offeree to show the offer was not made in good faith." (*Covert v. FCA USA, LLC* (2022) 73 Cal.App.5th 821, 833.)

" 'Whether a section 998 offer was reasonable and made in good faith is a matter left to the sound discretion of the trial court, and will not be reversed on appeal except for a clear abuse of discretion.' " (*Najera v. Huerta* (2011) 191 Cal.App.4th 872, 877.) "Such a discretionary ruling will not be disturbed on appeal absent a showing that discretion was exercised in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice." (*Ibid*.)

### C.    *Analysis.*

Ag-Wise argues plaintiffs' section 998 offer had no reasonable prospect of acceptance because the offer intentionally sought the full insurance policy limit of $6 million from Ag-Wise knowing the policy also covered Wildwood as an additional insured. Because the implied covenant of good faith and fair dealing precludes an insurer from accepting a settlement offer that would exhaust coverage and leave another insured bereft of coverage (*Strauss v. Farmers Ins. Exchange* (1994) 26 Cal.App.4th 1017, 1021–1022), Ag-Wise contends its insurer could not accept an offer to resolve only the claims against Ag-Wise and leave Wildwood without coverage.[34]

This case is analogous to *Arno v. Helinet Corp.* (2005) 130 Cal.App.4th 1019 (*Arno*), relied on by plaintiffs here. In *Arno*, the plaintiff (Arno) was injured in a helicopter crash and sued the helicopter pilot and the pilot's employer. Arno made separate section 998 offers to the pilot and the employer. After trial, the trial court awarded Arno prejudgment interest under Civil Code section 3291 and expert witness fees under section 998. (*Arno*, at p. 1022.) The pilot argued on appeal Arno's section 998 offer was not made in good faith. The pilot claimed one insurance company covered all the defendants and controlled the defense; after a settlement with and dismissal of the pilot, Arno would still be able to pursue the full judgment against the codefendants less a set off for the settlement and the insurer thus would have gained nothing by accepting Arno's offer. (*Arno*, at p. 1024.)

The court of appeal held the trial court did not abuse its discretion in awarding Arno prejudgment interest and expert witness fees. (*Arno*, *supra*, 130 Cal.App.4th at p. 1027.) The court found the interests of the defendants' insurer did not restrict the trial

---

[34]    Ag-Wise does not contend the *amount* of plaintiffs' offer was unreasonable, and the amount is presumed reasonable in view of plaintiffs' recovery. (*Covert v. FCA USA, LLC*, *supra*, 73 Cal.App.5th at pp. 833–834 [where the offeror obtains a judgment more favorable than its offer, the judgment is prima facie evidence the offer was reasonable].)

court's discretion, reasoning that "[s]ection 998 provides for service of a pretrial settlement offer to a *party* to the action, not to that party's insurer. (§ 998, subds. (b), (c), (d) & (e).) Service of a section 998 offer on the insurer of a party is not even valid. [Citations.] The existence of an insurance policy is not a guarantee that the insurer is obligated under the policy to provide coverage or a defense for a given action." (*Arno*, at pp. 1025–1026.) The court concluded Arno was not barred from recovery under section 998 although his section 998 offer did not relieve the other defendants of liability because "[s]ection 998 does not require a plaintiff to make a global settlement offer to all defendants in an action, or to make an offer that resolves all aspects of a case." (*Arno*, at p. 1026.) The court held the purpose of section 998 "would be frustrated if a party could elude the application of the statute by being able to restrict a trial court's discretion with considerations facing that party's insurer or other codefendants. Notwithstanding any strategies that could be attributed to Arno, the trial court did not abuse its discretion in applying section 998 sanctions in this case." (*Arno*, at p. 1027.)

Similarly, here, plaintiffs made a section 998 offer to Ag-Wise that did not include a release of liability for codefendant, Wildwood. Pursuant to *Arno*, plaintiffs were not required to make a global settlement offer to resolve their claims against both Ag-Wise and Wildwood. Making separate section 998 offers to the defendants thus did not render plaintiffs' offer to Ag-Wise unreasonable. The trial court properly considered insurance as a factor, but as the court indicated, it was unclear if Wildwood intended to seek coverage under Ag-Wise's policy. As plaintiffs point out, Wildwood had its own $20 million insurance policy separate and apart from Ag-Wise's policy. The court found the fact that the offer may have put Ag-Wise in a difficult situation did not render it unreasonable and this finding is supported by *Arno*. The court further observed Ag-Wise could have explored a counteroffer. Though Ag-Wise claims there is no evidence plaintiffs would have accepted a lower offer, there is likewise no evidence plaintiffs would have rejected a counteroffer.

Because the trial court acted within its discretion in finding plaintiffs' section 998 offer was reasonable and in good faith, we will not disturb the award of prejudgment interest and expert witness fees.

## **DISPOSITION**

The judgment and postjudgment cost order are affirmed. Plaintiffs to recover their costs on appeal.

LEVY, Acting P. J.

WE CONCUR:

FRANSON, J.

PEÑA, J.

62.

## <u>CERTIFIED FOR PARTIAL PUBLICATION</u>

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| GLORIA RUCKMAN et al., | F086037 & F086187 |
| Plaintiffs and Respondents, | (Consolidated) |
| v. | (Super. Ct. No. BCV-15-101699) |
| AG-WISE ENTERPRISES, INC., | **ORDER GRANTING PARTIAL PUBLICATION AND MODIFYING OPINION** |
| Defendant and Appellant. | **[NO CHANGE IN JUDGMENT]** |

It appearing that part of the nonpublished opinion filed in the above entitled matter on December 3, 2025, meets the standards for publication specified in California Rules of Court, rule 8.1105(c), IT IS ORDERED that the opinion be certified for publication with the exception of parts I.C., II., III., and IV. of the Discussion.

Additionally, it is ordered that the opinion filed herein be modified as follows:

1. On page 2, delete the third paragraph, that reads, "We affirm the judgment and post-judgment cost order" and replace it with the following:

> In the published portion of this opinion, we explain that an independent contractor's employee and an innocent bystander bear different burdens of proof when seeking liability against the hirer of an independent contractor under the retained control exception to the general rule of nonliability. While an independent contractor's employee must show the hirer negligently exercised retained control in a way that affirmatively contributed to the employee's injury, an innocent bystander must show the hirer retained control

over the contractor's work and the hirer's exercise of that retained control was a substantial factor in bringing about the bystander's injury. We conclude the trial court's instruction on the retained control exception was supported by substantial evidence and accurately stated the law. In the unpublished portion, we explain Ag-Wise's remaining contentions are without merit. Accordingly, we affirm the judgment and postjudgment cost order.

There is no change to the judgment.

LEVY, Acting P. J.

WE CONCUR:

FRANSON, J.

PEÑA, J.

2.